ORAL ARGUMENT NOT YET SCHEDULED

No. 14-7017

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

IN RE HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES LITIGATION

ARKANSAS PUBLIC EMPLOYEES' RETIREMENT SYSTEM, ET AL.

*Plaintiffs-Appellants,*

v.

HARMAN INTERNATIONAL INDUSTRIES, INC., ET AL.

*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Columbia

**PAGE PROOF BRIEF FOR APPELLEES**

JONES DAY

ROBERT C. MICHELETTO
KELLY A. CARRERO
IAN SAMUEL
222 East 41st Street
New York, NY 10017
(212) 326-3939
(212) 755-7306 (fax)

TRACI L. LOVITT
100 High Street, 21st Floor
Boston, MA 02110
(617) 960-3939
(617) 449-6999 (fax)

THOMAS F. CULLEN, JR.
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939
(202) 626-1700 (fax)

*Counsel for Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), counsel for Appellees Harman International Industries, Inc., Sidney Harman, Kevin Brown, Sandra B. Robinson, and Dinesh Paliwal hereby certifies the following:

**A.     Parties**

The following party appeared as lead plaintiff before the District Court and is an appellant before this Court:

- Arkansas Public Employees' Retirement System

The following parties appeared as defendants before the District Court and are appellees before this Court:

- Harman International Industries, Inc.

- (the late) Sidney Harman

- Kevin Brown

- Sandra B. Robinson

- Dinesh Paliwal

**B.     Rulings Under Review**

Appellant seeks review of the January 17, 2014 Order & Opinion Granting Defendants' Motion to Dismiss in Case No. 07-1757, United States District Court for the District of Columbia, Docket No. 57.

**C.    Related Cases**

Appellees are not aware of any related cases before this Court.

Dated: August 11, 2014                    Respectfully submitted,

**/s/ Traci L. Lovitt**

JONES DAY
Thomas F. Cullen, Jr.
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Email: tfcullen@jonesday.com
Tel: (202) 879-3939
Fax: (202) 626-1700

Robert C. Micheletto
Kelly A. Carrero
Ian Samuel
222 East 41st Street
New York, New York 10017
Email: rmicheletto@jonesday.com
Email: kacarrero@jonesday.com
Email: isamuel@jonesday.com
Tel: (212) 326-3939
Fax: (212) 755-7306

Traci L. Lovitt
100 High Street, 21st Floor
Boston, Massachusetts 02110
Email: tlovit@jonesday.com
Tel: (617) 960-3939
Fax: (617) 449-6999

*Counsel for Appellees*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C.

Circuit Rule 26.1, counsel for Appellee Harman International Industries, Inc.

("Harman") hereby states the following:

Harman is a premier designer and manufacturer of high quality, high

fidelity audio products and electronic systems for the automotive, consumer,

and professional markets in the Americas, Europe, and Asia.  It is a stock

corporation organized under the laws of the State of Delaware.  Harman has

no parent, subsidiary or affiliate that has any outstanding securities in the

hands of the public.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES .................................................................. i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ........................ iii

TABLE OF CONTENTS............................................................... iv

TABLE OF AUTHORITIES .......................................................... vi

GLOSSARY OF ABBREVIATIONS ........................................... xiii

JURISDICTION ......................................................................... 1

QUESTIONS PRESENTED .......................................................... 1

STATEMENT OF FACTS ............................................................ 2

    A.    Harman's Statements Regarding European PND Sales............ 2

    B.    Procedural History ................................................. 9

SUMMARY OF THE ARGUMENT ............................................. 13

STANDARD OF REVIEW ........................................................ 17

ARGUMENT............................................................................ 18

I.    DR. HARMAN'S AND MR. BROWN'S STATEMENTS ARE
    PROTECTED BY THE PSLRA'S SAFE HARBOR ...................... 19

    A.    The Statements Are Forward Looking................................... 19

        1.    APERS conceded the forward-looking nature of
        the statements in the district court ................................ 19

        2.    Dr. Harman's "plan is proceeding" statement is
        forward looking............................................................. 22

        3.    Mr. Brown's statement was forward looking ............... 29

B.    The Statements Were Accompanied By Meaningful Cautionary Language ............................................................... 31

    1.    Dr. Harman's statement was accompanied by meaningful warnings about the European PND market. ......................................................................... 33

    2.    The same cautionary language adequately hedges Mr. Brown's statement. ................................................ 34

    3.    APERS' contrary argument is wrong .......................... 36

C.    State Of Mind Should Not Be Considered Under The "Meaningful Cautionary Statement" Safe Harbor ................. 38

D.    APERS' State Of Mind Argument Fails As A Factual Matter. ................................................................................. 49

II.    HARMAN'S CHARACTERIZATION OF HISTORICAL SALES FIGURES AS "STRONG" IS INACTIONABLE PUFFERY ...................................................................................... 52

A.    Harman's "Very Strong" Statement Is Vague And Incapable of Verification.......................................................... 52

B.    APERS' Contrary Argument Ignores The Statement's Inherent Vagueness ...................................................... 54

III.    APERS FAILED TO ADEQUATELY PLEAD LOSS CAUSATION ................................................................................ 56

IV.    PLAINTIFF'S § 20(A) CLAIM SHOULD BE DISMISSED GIVEN THE ABSENCE OF ANY PRIMARY VIOLATION OF § 10(B) OR RULE 10B-5........................................................ 61

CONCLUSION......................................................................................... 63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

v

# TABLE OF AUTHORITIES

**Page**

**C**ASES

(Authorities on which we chiefly rely are marked with an asterisk.)

*Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Fed. Elec.
Comm'n*,
333 F.3d 168 (D.C. Cir. 2003)...................................................... 39

*Arazie v. Mullane*,
2 F.3d 1456 (7th Cir. 1993) ...................................................... 51

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)...................................................... 17

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) ...................................................... 44

*Basic, Inc. v. Levison*,
485 U.S. 224 (1988)...................................................... 51

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...................................................... 17

*Carney v. American University*,
151 F.3d 1090 (D.C. Cir. 1998)...................................................... 55

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...................................................... 52

*Conn. Nat'l Bank v. Germain*,
503 U.S. 249 (1992)...................................................... 39

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Constr. Laborers Pension Trust of Greater St. Louis v.*
   *Neurocrine Biosciences, Inc.*,
   No. 07-cv-1111, 2008 U.S. Dist. LEXIS 38899
   (S.D. Cal. May 13, 2008) (unpublished) .................................. 29

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
   398 F.3d 666 (D.C. Cir. 2005).................................................. 17

*Custis v. United States*,
   511 U.S. 485 (1994).................................................................. 42

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003).............................................................. 42, 48

\* *Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005)....................................................... 56, 58, 59

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP*
   *Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ..................................................... 52

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976).................................................................. 62

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   594 F. 3d 783 (11th Cir. 2010) ................................................. 43

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008) ...................................... 57

*Gozlon-Peretz v. United States*,
   498 U. S. 395 (1991) ........................................................... 41, 42

*Grossman v. Novell, Inc.*,
   120 F. 3d 1112, 1119 (10th Cir. 1997).................................... 52

# TABLE OF AUTHORITIES
(continued)

**Page**

\* *Harris v. Ivax Corp.*,
   182 F.3d 799 (11th Cir. 1999) ........................................ 24, 25, 32, 38, 44

*Helwig v. Vencor, Inc.*,
   251 F.3d 540 (6th Cir. 2003) ................................................. 44

*In re Baan Sec. Litig.*,
   103 F. Supp. 2d 1 (D.D.C. 2000) ........................................... 46

*In re Boeing Sec. Litig.*,
   40 F. Supp. 2d 1160 (W.D. Wash. 1998) ................................. 29

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) .................................... 53

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) .............................................. 43

*In re Donald J. Trump Casino Sec. Litig.*,
   7 F.3d 357 (3d Cir. 1993) ................................................. 45, 46

\* *In re Fed. Nat'l Mortgage Ass'n Sec.
   Deriv. and "ERISA" Litig.*,
   503 F. Supp. 2d 25 (D.D.C. 2007) ............................... 61, 62, 63

*In re Federal-Mogul Corp. Sec. Litig.*,
   166 F. Supp. 2d 559 (E.D. Mich. 2001) ................................. 29

*In re Initial Public Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005) .................................... 57

*In re REMEC Inc. Sec. Litig.*,
   702 F. Supp. 2d 1202 (S.D. Cal. 2010) .................................. 27

*In re Secure Computing Corp. Sec. Litig.*,
   120 F. Supp. 2d 810 (N.D. Cal. 2000) ................................... 27

# TABLE OF AUTHORITIES
(continued)

**Page**

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001)................................................. 53

*In re Stone & Webster, Inc. Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005).................................................. 28

*In re Williams Sec. Litig.-WCG Subclass*,
558 F.3d 1130 (10th Cir. 2009) ............................................. 59

* *In re XM Satellite Radio Holdings Sec. Litig.*,
479 F. Supp. 2d 165 (D.D.C. 2007)....................................... 31, 32, 52, 54

*Kellmer v. Raines*,
674 F.3d 848 (D.C. Cir. 2012)................................................ 48

*Kowal v. MCI Communications Corp.*,
16 F.3d 1271 (D.C. Cir. 1994)......................................... 46, 53

*Lentell v. Merrill Lynch & Co.,*
396 F. 3d 173 (2d Cir. 2005) ........................................... 57, 58

* *Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...................................... 26, 27, 31

*Meijer, Inc. v. Biovail Corp.*,
533 F.3d 857 (D.C. Cir. 2008)................................................ 21

*Miller v. Champion Enters., Inc.*,
346 F.3d 660 (6th Cir. 2003) ................................................ 43

*Mishkin v. Ageloff*,
No. 97-cv-2690, 1998 U.S. Dist. LEXIS 14890
(S.D.N.Y. Sept. 23, 1998)....................................................... 62

*Nuveen Mun. High Income Opportunity Fund v. City of*
*Alameda*,
730 F.3d 1111 (9th Cir. 2013) ............................................... 59

# TABLE OF AUTHORITIES
(continued)

**Page**

*Pasley v. Freeman.*,
  100 Eng. Rep. 450 (1789)................................................................... 56

*Poliquin v. Garden Way, Inc.*,
  989 F.2d 527 (1st Cir. 1993)............................................................... 22

*Republic Property Trust v. Republic Properties Corp.*,
  540 F. Supp. 2d 144 (D.D.C. 2008)..................................................... 61

*Rochester Laborers Pension Fund v. Monsanto Co.*,
  883 F. Supp. 2d 835 (E.D. Mo. 2012) ................................................. 29

*Rochon v. Gonzales*,
  438 F.3d 1211 (D.C. Cir. 2006)............................................................ 17

*Roosevelt v. E.I. Du Pont de Nemours & Co.*,
  958 F.2d 416 (D.C. Cir. 1992)........................................................ 21, 22

*Saltzberg v. TM Sterling/Austin Assocs.*,
  45 F.3d 399 (11th Cir. 1995) .............................................................. 45

*San Leandro Emergency Med. Group Profit Sharing Plan v.*
  *Philip Morris Companies*,
  75 F.3d 801 (2d Cir. 1996) ........................................................... 46, 50

*Schaaf v. Residential Funding Corp.*,
  517 F.3d 544 (8th Cir. 2008) .............................................................. 59

* *SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ................................................... 38, 61, 62

*SEC v. J.W. Barclay & Co.*,
  442 F.3d 834 (3d Cir. 2006) ............................................................... 62

*SEC v. Savoy Industries, Inc.*,
  587 F.2d 1149 (D.C. Cir. 1978)........................................................... 61

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Skilling v. United States*,
  561 U.S. 358 (2010)............................................................. 45

*Slayton v. American Express*,
  604 F.3d 758 (2d Cir. 2010) ........................................... 43, 44

*Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*,
  365 F.3d 353 (5th Cir. 2004) .......................................... 43, 44

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ................................................ 18

\* *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)................................................... 17, 26, 27

*TSC Industries, Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)............................................................. 55

*United States v. Garcia*,
  718 F.2d 1528 (11th Cir. 1983), *aff'd* 469 U.S. 70 (1984)..................... 42

*United States v. Morgan*,
  384 F.3d 1 (1st Cir. 2004)..................................................... 21

*United States v. Stearns*,
  387 F.3d 104 (1st Cir. 2004)................................................. 21

*United States v. Volvo Powertrain Corp.*,
  No. 12-5234, 2014 BL 199210
  (D.C. Cir. July 18, 2014) ................................................... 21

**STATUTES**

15 U.S.C. § 78aa ............................................................... 1

15 U.S.C. § 78t(a) ............................................................ 61

15 U.S.C. § 78u-4(b)(1) ...................................................... 18

# TABLE OF AUTHORITIES
## (continued)

**Page**

15 U.S.C. § 78u-4(b)(4) ............................................................. 56

\* 15 U.S.C. § 78u-5(i)(1)(A)-(D) .................................... 22, 23, 24, 25, 29, 30

15 U.S.C. § 78u-5(c) .................................................................. 40

\* 15 U.S.C. § 78u-5(c)(1)(A) ............................................... 19, 32, 40

15 U.S.C. § 78u-5(c)(1)(B) ......................................................... 42

\* 15 U.S.C. § 78u-5(e) ........................................... 2, 3, 4, 18, 40, 41, 42, 47

28 U.S.C. § 1291 ........................................................................ 1

28 U.S.C. § 1331 ........................................................................ 1

§ 10(b) and § 20(a) of the Securities Exchange Act of 1934 ................. 10, 61

**OTHER AUTHORITIES**

SEC Rule 10b-5 .................................................................. 10, 61

Fed. R. Civ. P. 12(b)(6) ....................................................... 18, 40

# GLOSSARY OF ABBREVIATIONS

APERS: Arkansas Public Employees Retirement System

FY2007: Fiscal Year 2007

FY2008: Fiscal Year 2008

GPS: Global Positioning System

PND: Personal Navigation Device

PSLRA: Private Securities Litigation Reform Act

## JURISDICTION

The Arkansas Public Employees' Retirement System ("APERS")

appeals from a final court order granting the appellees'—Harman

International Industries, Inc. ("Harman"), the late Dr. Sidney Harman ("Dr.

Harman"), Kevin Brown ("Brown"), Sandra B. Robinson ("Robinson"), and

Dinesh Paliwal ("Paliwal") (collectively the "Harman Defendants")—

motion to dismiss. The district court properly exercised jurisdiction under

28 U.S.C. § 1331, and § 27 of the Securities Exchange Act of 1934, 15

U.S.C. § 78aa. Accordingly, this Court has jurisdiction under 28 U.S.C.

§ 1291.

## QUESTIONS PRESENTED

1.      Were Dr. Harman's and Mr. Brown's statements regarding Harman's

Personal Navigation Devices ("PNDs") protected by the Private Securities

Litigation Reform Act's ("PSLRA's") safe harbor for forward-looking

statements accompanied by meaningful cautionary language?

2.      Was Harman's characterization of its PND sales as "very strong"

immaterial puffery?

3.      Has APERS adequately pled loss causation?

## STATEMENT OF FACTS

The following facts include allegations from APERS' complaint, which the Harman Defendants assume true for purposes of this appeal only, and cautionary statements the Court is authorized to consider under the PSLRA. *See* 15 U.S.C. § 78u-5(e).

### A.     Harman's Statements Regarding European PND Sales

Harman is a premier designer, manufacturer, and seller of high quality, high fidelity audio products and electronic systems for the automotive, consumer, and professional markets in the Americas, Europe, and Asia. D.I. 20 ("Compl.") ¶ 3.[1] This case concerns Harman's PNDs, in particular its PND sales in Europe. PNDs provide Global Positioning System ("GPS") navigation, traffic information, video, and other audiovisual capabilities, and are sold as after-market automotive parts. *See id.* ¶¶ 3, 49. In 2006, Harman first started marketing PNDs in Europe, selling 35,000 in the first three months of the year, and an additional 95,000 by October 2006. *Id.* ¶ 49. In light of these results, Dr. Harman projected that Harman would sell "well over 500,000" PNDs during fiscal year 2007 ("FY2007"), which spanned from July 1, 2006, to June 30, 2007. *Id.* ¶¶ 49-50. By December

---

[1] Citations to "D.I." followed by a number indicate the docket number assigned to the document on the District Court's docket sheet.

2006, Harman sold an additional 130,000 PNDs and revised its FY2007 projected PND sales to over 650,000.  *Id.* ¶ 51.  The then-PND sale price was $350 per unit.  *Id.*

On April 26, 2007, Harman conducted an earnings call to discuss its results for third quarter FY2007, which ended March 31, 2007.  *Id.* ¶¶ 57-60. The call's moderator warned that the speakers would make forward-looking statements about "[Harman's] beliefs and expectations as to future events and trends affecting the company's business and are subject to risks and uncertainties."  D.I. 21-4 ("Will Decl."), Exh. 8 (Transcript of Harman International Industries Earnings Release Conference Call (Apr. 26, 2007)) at 1.  The moderator directed attendees to review Harman's SEC filings to evaluate those risks and uncertainties.  *Id.*

During the call, Dr. Harman discussed Harman's European PND business.  He warned that "[i]n the recent quarter, the European PND market has become extremely competitive."  *Id.* at 7.  In addition, Dr. Harman disclosed that "PND inventories in Europe had grown substantially."  *Id.*  He cautioned that Harman would have to "work[] extraordinarily hard to increase sales and to maintain adequate margins in that environment."  *Id.* Dr. Harman also referenced Harman's planned sales efforts, observing that "[t]he plan forecasts total unit sales of 618,000 units for the fiscal '07 year,

3

and that plan is proceeding." *Id.*; Compl. ¶ 57. Finally, Dr. Harman acknowledged that "because of higher competition, [the company was] seeing pricing pressure." Will Decl., Exh. 8 at 14. Mr. Brown subsequently stated that approximately 84,000 PND units had been sold in Europe between January and March 2007, which brought the total PND sales for the first nine months of FY2007 to approximately 300,000. *Id.* at 17.

On August 29, 2007, Harman filed its FY2007 annual report. Compl. ¶ 78. In the report's opening section, Harman observed that the report "contains forward-looking statements . . . [that] are not guarantees of performance or results . . . [and] involve risks, uncertainties and assumptions." Will Decl., Exh. 1 (Harman International Industries, 2007 Annual Report (Form 10-K) (August 29, 2007)) at 12-13. It also noted the numerous "[f]actors that may cause fluctuations in our operating results and/or the price of our common stock," such as "competition in the automotive, consumer or professional markets in which [Harman] operate[s]." *Id.* In the report's section on "Risk Factors," Harman disclosed specific risks to its business and share price. *Id.* at 22-28. For example: (i) "the audio and video product markets that [Harman] serve[s] are fragmented, highly competitive, rapidly changing and characterized by intense price competition"; (ii) "[Harman's] products may not satisfy shifting consumer

4

demand or compete successfully with competitors' products"; (iii) "[i]f

[Harman] fail[s] to introduce new products, misinterpret[s] consumer

preferences or fail[s] to respond to changes in the marketplace, consumer

demand for [its] products could decrease"; and, (iv) "[Harman] may lose

market share if [it is] unable to compete successfully against [its] current and

future competitors." *Id.* at 23-24.

In the report's "Management's Discussion and Analysis of Financial

Condition and Results of Operation" section, Harman warned that "[t]his

discussion contains forward-looking statements which are based on our

current expectations and experience and our perception of historical trends,

current market conditions, . . . expected future developments, . . . and other

factors that we believe are appropriate under the circumstances" and that

"involve risks and uncertainties that could cause actual results to differ

materially . . . ." *Id.* at 34.[2]  As part of its discussion of European PND

sales, Harman stated that "[s]ales of aftermarket products, particularly

PNDs, were very strong during fiscal 2007." *Id.* at 39; Compl. ¶ 82.

---

[2] Harman's Form 10-K for its 2006 fiscal year, filed on September 6, 2006, contains these warnings as well. *See* Will Decl., Exh. 26 (Harman International Industries, 2006 Annual Report (Form 10-K) (September 6, 2006)) at 22, 28, 30-32.

On September 27, 2007, Harman conducted an analyst and investor call after a previously-announced merger was abandoned.  Compl. ¶ 98; Will Decl., Exh. 18.  The moderator stated that the call would include forward-looking statements, such as "Harman's beliefs and expectations as to future events and trends affecting the Company's business" that were "subject to risks and uncertainties."  Will Decl., Exh. 18 (Transcript of Harman International Industries Analyst and Investor Call (Sept. 27, 2007)) at 1.  The moderator encouraged listeners (*id.*) to review Harman's SEC filings regarding those risks and uncertainties, which would have included the aforementioned FY2007 annual report and its warnings, *see supra* pp. 7-8.

During the call, Mr. Brown stated that "[f]irst quarter fiscal '08 [total net] sales are forecast to be $950 million, an increase of 15% compared to the first quarter of fiscal '07."  *Id.* at 4.  He continued:  "[w]e expect [a]utomotive sales to increase approximately 15% during the quarter, primarily due to the ramp-up of an infotainment system program and higher PND sales in Europe."  *Id.*  Subsequently, an analyst observed that "the $950 million of revenue expectation is [the] highest number you've ever achieved" and asked whether that number was influenced by "the spillover of [Mercedes] C Class revenues."  *Id.* at 6.  Mr. Brown responded:

> Yes, Peter, you are correct that that is a very strong
> first quarter on the top line for us, reflecting

> getting fully up the ramp curve on Mercedes C
> Class but also reflecting the fact that we are
> bringing additional business on-stream at Chrysler
> as we ramp up our Missouri plant and in the PND
> business, where we continue the growth and
> expansion of that business primarily in Europe.

*Id.*; Compl. ¶ 101.

On November 9, 2007, Harman disclosed its *actual* first quarter

FY2008 results.  As Mr. Brown predicted, net sales were approximately

$947 million, an increase of approximately 15% compared to first quarter

FY2007.  *See* Will Decl., Exh. 23 at 8; *id.* Exh. 29 at 4.

On January 14, 2008, Harman issued a press release revising its

overall guidance for FY2008.  Compl. ¶ 109; Will Decl., Exh. 19 (Press

Release, Harman International Industries, *Harman International Revises*

*Fiscal Year 2008 Earnings Guidance* (Jan. 14, 2008)) at 1.  In the release,

Harman stated that "[t]he change in guidance was prompted primarily by a

major shift in the market for Portable Navigation Devices (PNDs)," and that

"[i]n recent months this sector has experience significant pricing pressure

affecting the entire industry."  *Id.*  Harman also stated that it would be

"launching a record number of automotive infotainment platforms in 2008"

and that the company was "not happy with the [associated] higher R&D

engineering and material costs."  *Id.*  Harman's share price dropped that day

from $68.97 to $43.00.  Compl. ¶ 110.

7

On February 5, 2008, Harman released its actual financial results for the FY2008 second quarter (October through December 2007). *Id.* ¶ 112; *see also* Will Decl., Exh. 20 at 2-4. Harman stated that "[a]lthough [the company] continue[d] to increase sales across all divisions, [its] automotive earnings [were] under pressure due to portable navigation devices (PND), product mix, and higher engineering and material costs during a period of record launch activity." Will Decl., Exh. 21 (Press Release, Harman International Industries, *Harman International Reports Higher Sales for Second Quarter Fiscal Year 2008; Earnings Down on PND, Product Mix and Costs* (Feb. 5, 2008)) at 1. The company also explained that "PND sales and margins decreased due to aggressive price reductions by competitors, the delay of new products, and the sale of older products at substantial discounts." *Id.* at 3; Compl. ¶ 113. Harman's share price fell from $45.73 to $38.70. Compl. ¶ 114.

The same day, Harman conducted an earnings call to report its second quarter FY2008 results. Will Decl., Exh. 20 (Transcript of Harman International Industries Second Quarter Earnings Conference Call (Feb. 5, 2008)). It reported net sales for the quarter of $1.1 billion, a 14% increase year-over-year. *Id.* at 2. Harman's gross profit as a percentage of sales, however, declined roughly 6%. *Id.* at 3. The company attributed the margin

8

decline to "the automotive division which experience[d] lower margins on P[N]D products, product mix range change including higher sales of infotainment systems to mid level vehicles and higher than expected material cost." *Id.* Harman also cited increased "selling general and administrative expenses" for the margin pressure. *Id.*

In addition to announcing its second quarter FY2008 results, the company disclosed that it would "face continuing bottom line pressure through 2008 and well into next year." *Id.* at 2. The "primary drivers of this deterioration [we]re P[N]D, [and] engineering and material cost." *Id.* Harman attributed the reduced PND margin equally to "a 60% decline in average market prices," "delayed product introductions and lower volume of new generation products," and the "inventory clearance of prior generation models at a loss." *Id.* In addition, Harman predicted $30 million of increased engineering costs attributable, not to PND, but to thirteen new product launches, and it predicted $20 million in additional material costs unrelated to PNDs. *Id.*

### B.    Procedural History

After previously-filed actions were consolidated under the caption *In re Harman International Industries Inc. Securities Litigation* and APERS was appointed lead plaintiff, on May 2, 2008, APERS commenced this

9

consolidated securities class action on behalf of individuals who purchased

Harman common stock between April 26, 2007, and February 5, 2008 (the

"Class Period").  APERS seeks damages from Harman and its then-

officers— the late Dr. Harman, Brown, Robinson, and Paliwal—for alleged

violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 and

Rule 10b-5.  Compl. ¶ 1.

As is relevant here, APERS claims that Harman's financial

projections with respect to European PND sales were misleading because the

Harman Defendants allegedly knew that "the Company's foray into PND

sales in Europe would cause material declines in its operating income as a

percentage of net sales during the Class period."  *Id.* ¶¶ 64, 69, 76, 77, 86,

102, 106, 111.  Specifically, APERS claims that the Harman Defendants

knew, but failed to disclose, that Harman had a large inventory of

supposedly obsolete PNDs, that it had purportedly agreed to sell the

inventory at a substantial discount, and, that according to APERS, Harman

had no reasonable basis for its PND sales projections.  *Id.* ¶¶ 56, 64, 69, 86,

102, 106, 111.

On July 3, 2008, the Harman Defendants filed the motion to dismiss at

issue here, arguing that the Complaint's allegations failed to prove (i) a

material misrepresentation or omission, (ii) scienter, or (iii) loss causation.

10

D.I. 21 (Defendants' Motion to Dismiss the Consolidated Class Action

Complaint) at 1-2.  On January 17, 2014, the district court granted the

motion.  It analyzed, first, APERS' argument that the forward-looking

statements were actionable because "they lacked a reasonable basis when

made" and lacked an "adequate warning."  D.I. 57 (Memorandum Opinion

Granting Defendants' Motion to Dismiss) ("D. Ct. Op.") at 15. After

acknowledging that the parties "are ***not*** in dispute as to whether any

particular statement is 'forward-looking,'" the court rejected APERS'

argument that it could consider the Harman Defendants' alleged knowledge

to determine whether the statements were accompanied by meaningful

cautionary language.  *Id.* at 16 (emphasis supplied).  The court reasoned that

the relevant safe harbor made "no explicit reference to the consideration of

the issuer's state of mind" and that the legislative history clearly revealed

that "[c]ourts *should not* examine the state of mind of the person making the

statement."  *Id.* at 21 (emphasis in original; internal quotation marks and

citation omitted).  Based on "[t]he text, legislative history, and canons of

statutory interpretation," the district court concluded that "[t]he issuer's state

of mind is irrelevant as to the subsection (A)(i) safe harbor."  *Id.* at 22.

    The court also rejected APERS' claim that the forward-looking

statements were not accompanied by sufficient warnings.  Citing Dr.

11

Harman's specific statements about Harman's large PND inventory and the

extremely competitive European market, the court found that Harman was

warning "not merely . . . about general market risks, but . . . [making

cautionary statements] specific to the European PND market of which

Plaintiffs complain."  *Id.* at 27-28.  "A reasonable investor would know that

'extreme' price pressure could substantially affect sales, margins, or both."

*Id.*

    With respect to the statement that Harman's PND sales were "very

strong," the district court held it non-actionable, immaterial puffery.

Harman's "very strong" statement, the court explained, "provide[d] no

standard against which a comparison can be drawn."  *Id.* at 36. "Indeed, the

description of Harman's PND sales as 'strong' could have signified a

truthful comparison to sales of the products in earlier quarters."  *Id.*[3]

Finding no securities fraud violation, the court reasoned that APERS'

§ 20(a) claim against Dr. Harman, Brown, Robinson, and Paliwal also failed.

*Id.*  APERS subsequently filed this appeal.

---

[3] In the district court, APERS also challenged statements relating to a failed acquisition of Harman by KKR and Goldman Sachs and to Harman's contract to sell "MyGIG radios," an automotive "infotainment" system, to DaimlerChrysler.  The district court rejected APERS' claims relating to those statements in their entirety.  APERS has not appealed those aspects of the district court's ruling.

## SUMMARY OF THE ARGUMENT

According to APERS, both (i) Dr. Harman's April 26, 2007 statement that "[t]he plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding," and (ii) Mr. Brown's September 27, 2007 statement that Harman's first quarter revenue projections were explained, in part, by "the PND business, where we continue the growth and expansion of that business primarily in Europe" were not forward looking and lacked sufficiently meaningful cautionary language, particularly in light of the Harman Defendants' purported knowledge.  In addition, APERs argues that (iii) Dr. Harman's August 29, 2007 statement that "[s]ales of aftermarket products, particularly PNDs, were very strong during fiscal 2007" is not puffery.  *See* Doc. #1496878 (Page Proof Brief of Appellant) ("APERS Br.") at 3.  These arguments, however, are legally and factually wrong.

As the district court correctly held, the first two statements were forward looking and amply hedged by specific cautionary language.   Dr. Harman warned that Harman had to work "extraordinarily hard" to increase sales and maintain its projected margins, that "PND inventories in Europe had grown substantially," that "the European PND market ha[d] become extremely competitive," that "because of higher competition, [the company was] seeing pricing pressure," that Harman's PND inventory "had grown

13

substantially" and that its PND inventory was up to approximately $50 million. Will Decl., Exh. 8 at 7, 14. These statements are specific and amply caution investors about the risks around Harman's European PND sales.

APERS' claim that the statements were insufficient because they did not warn specifically of inventory obsolescence misses the mark. APERS ignores the numerous warnings in Harman's annual report regarding obsolescence risk. But more fundamentally, APERS ignores the disconnect between its argument and the asserted misstatements. The alleged misstatements concerned future PND *unit sales*, which are not necessarily from PND inventory. Indeed, APERS alleges that Harman was creating and selling new PND models during this period. And, APERS' argument ultimately hinges on its legally baseless claim that Harman should have warned more specifically due to its supposed knowledge of actual obsolescence.

With respect to APERS' knowledge-based argument, it has no basis whatsoever in the statute itself, which is presumably why APERS fails to cite the safe harbor's text. The safe harbor, by its terms, requires courts to examine only the cautionary language. But more, the PSLRA creates a *separate and distinct* safe harbor for forward looking statements that are not

14

supported by allegations that the issuer had actual knowledge of their falsity when made.  If this safe harbor were imported into the one for meaningful cautionary statements, the latter would have no independent function or meaning.  Indeed, as plaintiffs always plead knowledge to avoid the knowledge-based safe harbor, neither would effectively be available on a motion to dismiss.  Accordingly, those courts that have considered the issue have overwhelmingly rejected APERS' knowledge argument.  APERS actual knowledge argument is also factually wrong.  It is clear from the face of APERS' complaint that the supposed knowledge relates to a *different* time period.  The basis for the knowledge allegations is confidential sources who had left Harman before the relevant period and who have not said, and cannot say, whether any Harman Defendant reviewed the materials the sources claim conferred knowledge.

Likely due to the weakness of its argument concerning Harman's cautionary language, APERS now takes the position that the statements at issue were not forward looking.  APERS, however, has affirmatively waived this argument, identifying the statements as forward looking in its brief to the district court.  For this reason, the district court observed that the parties "are not in dispute as to whether any particular statement is 'forward-looking.'"  D. Ct. Op. at 16.  At the very least, APERS did not raise its

15

current argument below and has provided no reason for this Court to consider it for the first time on appeal. And, APERS' argument is wrong. Particularly read in context, the statements concern future projections, management's plans and objectives, or the assumptions underlying a projection—all of which are defined as forward looking under the PSLRA.

With respect to Harman's "very strong" statement, here too, the district court was right. Harman provided no context against which to evaluate the statement, which is the hallmark of immaterial puffery. Indeed, if interpreted as comparing the then-current quarter to past quarters, the statement was true. And Harman made the statement in the context of disclosing actual results, which reasonable investors could evaluate themselves.

Even if this Court were to conclude that any of the three statements is actionable, it should still affirm the district court's judgment. APERS has failed to adequately plead loss causation. It is well settled that a company's failure to reach a projection is not, as a matter of law, an adequate basis for asserting loss causation. In addition, the Complaint identifies numerous other factors that APERS alleges caused the same loss. Thus, by APERS' own admission, loss causation is an intractable tangle of numerous factors.

16

For these reasons and those discussed below, the district court correctly

dismissed APERS' Complaint.

## STANDARD OF REVIEW

This Court reviews an order granting a motion to dismiss *de novo*.

*Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006); *Covad*

*Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 670 (D.C. Cir. 2005).  Thus,

like the district court, this Court must evaluate whether the complaint

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to

relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The

factual allegations "must be enough to raise a right to relief above the

speculative level."  *Twombly*, 550 U.S. at 555-56 (citations omitted).

Similarly, legal conclusions stated as factual allegations are not presumed

true.  *See id.* at 555.  "Threadbare recitals of the elements of a cause of

action, supported by mere conclusory statements," are insufficient to

withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.

The PSLRA heightens the usual standard of review by requiring the

plaintiff both to identify each misleading statement or omission and to

explain why it was misleading in the complaint.  *See Tellabs, Inc. v. Makor*

*Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007).  In addition, the PSLRA

"authorize[es] the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegation of a misrepresentation or omission." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) (citing 15 U.S.C. § 78u-4(b)(1) (2006)). Finally, the PSLRA modifies Rule 12(b)(6)'s evidentiary limits by requiring courts to consider "any [cited] cautionary statement accompanying [a] forward-looking statement," regardless of whether it is alleged in the complaint. 15 U.S.C. § 78u-5(e) (2012).

APERS cannot avoid dismissal under these standards. The Complaint and Harman's cautionary warnings demonstrate that the three statements APERS claims are false and misleading are protected by the PSLRA's safe harbor for forward looking statements or are immaterial puffery, and cannot be the legal cause of APERS' asserted loss. In all events, APERS' Complaint, on its face, disproves loss causation. Accordingly, APERS can state no securities fraud claim against Harman and can assert no control-person claims against the individual, officer defendants.

## ARGUMENT

## I.    DR. HARMAN'S AND MR. BROWN'S STATEMENTS ARE PROTECTED BY THE PSLRA'S SAFE HARBOR.

Contrary to APERS' claim, neither Dr. Harman's April 26, 2007 statement that "[t]he plan forecasts total unit sales of 618,000 units for the

18

fiscal '07 year, and that plan is proceeding," nor Mr. Brown's September 27, 2007 statement that Harman's first quarter revenue projections were explained, in part, by "the PND business, where we continue the growth and expansion of that business primarily in Europe" can be the basis of a claim. Both are protected by the PSLRA's safe harbor.

The PSLRA immunizes from liability (i) "any forward-looking statement" that is "identified as such" and (ii) is "accompanied by meaningful cautionary statements." 15 U.S.C. § 78u-5(c)(1)(A). As the district court correctly found, both conditions are satisfied here in connection with Dr. Harman's and Mr. Brown's statements.

## A.    The Statements Are Forward Looking.

### 1.    APERS conceded the forward-looking nature of the statements in the district court.

There can be no genuine dispute that Dr. Harman's and Mr. Brown's statements satisfy the forward-looking requirement, because APERS conceded the issue below. As the district court correctly observed, the parties "[we]re not in dispute as to whether any particular statement is 'forward-looking' as defined by the PSLRA. Rather, they dispute whether Defendants' forward-looking statements meet the conditions for protection of the subsection (A)(i) safe harbor." D. Ct. Op. at 16; *see also id.* at 15 ("Without a doubt, the parties' primary legal dispute relates to those alleged

19

misrepresentations that *are* 'forward-looking' in nature.") (emphasis supplied).  In a footnote, the court explained that "Plaintiffs do allege that many of the statements were not identified as forward-looking when made. However, they did not move forward with this theory in their briefing on the motion to dismiss."  *Id.* at n. 4 (internal citation omitted); *see also id.* at 25 ("[P]laintiffs allege that there were two false or misleading *forward-looking* statements in Dr. Harman's prepared remarks during the company's April 26, 2007 conference call.") (emphasis supplied); *id.* at 33 (stating with respect to Mr. Brown's asserted misrepresentation that "the parties *do not dispute* that the statement is forward-looking and identified as such") (emphasis supplied).

Indeed, APERS *affirmatively characterized* the PND-related statements at issue here as forward looking in its opposition to the motion to dismiss.  The statements were consistently included in the sections of APERS' brief identified as concerning "statements that were forward-looking," and were consistently referenced by APERS as "forward-looking Class Period statements."  D.I. 26 (Lead Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss the Consolidated Class Action Complaint) ("APERS Opp. to Mot. to Dismiss") at 3, 12, 13.  *See also id.* at 4 (including PND argument in the forward looking statements section), *id.* at

13-15 (same).  While APERS did claim that some historical statements were untrue, none of the statements at issue on appeal were identified as current or historical fact in APERS' district court brief.  *See* APERS Opp. to Mot. to Dismiss at 3, 12.

By identifying the PND related statements as forward looking, APERS "affirmatively waived" the point for appeal.  *United States v. Volvo Powertrain Corp.*, No. 12-5234, 2014 BL 199210, at *6 (D.C. Cir. July 18, 2014).  As a result, the statements should be deemed forward looking and APERS' contrary argument adjudged non-reviewable.  *See United States v. Stearns*, 387 F.3d 104, 108 (1st Cir. 2004) ("Although we can review forfeited error for plain error, arguments which have been affirmatively waived are not normally reviewable on appeal"); *United States v. Morgan*, 384 F.3d 1, 7 (1st Cir. 2004) (same).

But even if this Court were to excuse APERS' affirmative waiver or conclude that its arguments were merely forfeited, the Court should adhere to its usual practice of refusing to "entertain an argument made for the first time on appeal."  *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 867 (D.C. Cir. 2008).  APERS did not advance its current challenge to the forward looking nature of Dr. Harman's or Mr. Brown's statements in the district court, and it is "not [this Court's] practice to entertain issues first raised on appeal."

21

*Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 419 & n. 5

(D.C. Cir. 1992). Litigation "is a winnowing process," and "the procedures

for preserving or waiving issues are part of the machinery by which courts

narrow what remains to be decided." *Poliquin v. Garden Way, Inc.*, 989

F.2d 527, 531 (1st Cir. 1993).

APERS has provided no reason to abandon this rule. To the contrary,

it simply ignores its waiver problem. Accordingly, there is no reason for this

Court to entertain APERS' affirmatively waived (and in all events new)

argument that Dr. Harman's and Mr. Brown's statements were not forward

looking. APERS Br. at 14-19.

> ### 2. Dr. Harman's "plan is proceeding" statement is forward looking.

But even if it were to entertain the argument, this Court should

conclude that the statements are forward looking. The PSLRA defines

"forward-looking" to mean, as is relevant here, a statement that (i) contains

"a projection of revenues, income (including income loss), earnings

(including earnings loss) per share, capital expenditures, dividends, capital

structure, or other financial items"; (ii) describes "the plans and objectives of

management for future operations"; (iii) projects "future economic

performance, including any such statement contained in a discussion and

analysis of financial condition by the management"; *or*, (iv) states "the

22

assumptions underlying or relating to any statement" described above.  15

U.S.C. § 78u-5(i)(1)(A)-(D).

Dr. Harman's statement that "[t]he plan forecasts total unit sales of

618,000 units for the fiscal '07 year, and that plan is proceeding" falls

squarely within this definition.  Dr. Harman expressly said that Harman's

management had a "forecast" for its PND business, which is necessarily a

forward-looking statement (*see id.* § 78u-5(i)(1)(A)), based on a projected

sales "plan," which is also necessarily a forward-looking projection (*id.*) or a

statement of "the plans and objectives of management for future operations"

(*id.* at § 78u-5(i)(1)(B)).  Because the forecast and plan, themselves, concern

future projections and plans, the statement "the plan is proceeding" is

necessarily about the plan going forward.

Any doubt is resolved by reading the statement in context:

> In our earnings call three months ago, it was noted that Harman
> Becker PND inventories in Europe had grown substantially.  We said
> then that the inventory had been developed to support a vigorous sales
> effort and that we plan to reduce it to normal levels at year-end.  The
> plan forecasts total unit sales of 618,000 units for the fiscal '07 year,
> and that plan is proceeding.  Where March 31 inventory was $75
> million, we expect April 30 inventory to be approximately $50
> million, May 31 inventory to be approximately $30 million, and June
> 30 inventory to be approximately $15 million.

Will Decl., Exh. 8 at 7.  Read in context, Dr. Harman is talking about a

vigorous, forward-looking sales plan, the forecast sales from that plan, the

23

plan proceeding through the end of April, May and June, and the projected impact of the planned sales on future inventory value in those months. In the context, the statement "that plan is proceeding" conveys that the plan is proceeding in the future—through the end of April, May and June. *See* Will Decl., Exh. 8 at 7.

Dr. Harman's final sentence further proves the point. He forecasts *future* inventory levels for end of April, May and June, proving that he is talking about the sales plan proceeding in the future and its projected future impact. *Id*. Accordingly, Dr. Harman's statement concerned projections, forecasts, and "the plans and objectives of management for future operations." § 78u-5(i)(1)(A)-(B); *see also Harris v. Ivax Corp.*, 182 F.3d 799, 805 (11th Cir. 1999) ("the challenges unique to this period in our history are now behind us" held a forward-looking statement).

APERS' contrary argument—that Dr. Harman's statement describes "current business conditions" (APERS Br. at 18-19)—is of no moment. As explained, this Court need not address this argument because it was affirmatively waived or at the very least forfeited for no compelling reason. *See supra* p. 20-22. The argument is also factually and legally wrong. As a factual matter, APERS wrongly assumes that Dr. Harman's "plan is proceeding" statement relates to past and current sales efforts. It does not.

24

Read in context, the statement concerns Harman's future sales efforts and the efforts' future impacts on inventory. *See supra* pp. 3-4.

In addition, APERS wrongly assumes (APERS Br. at 17-18) that the purported obsolescence of *inventory* rendered a statement about projected PND *unit sales* false. At the time of Dr. Harman's statement, Harman was designing new PND models for sale. *See* Compl. ¶ 54. Inventory was not its only PND product for sale. Thus, as the district court explained, "[t]o the extent that [APERS] argues that [Harman's] projections about PND *sales* are misleading because it amassed a large *inventory* of PNDs, [APERS has] not pleaded with specificity how a large inventory would negatively impact sales of a product." D. Ct. Op. at 34 n. 10.

APERS' argument also fails as a matter of law. The PSLRA does not exclude all current statements from the safe harbor's scope. "Forward-looking conclusions often rest both on historical observations and assumptions about future events," and all are within the definition to avoid "hamper[ing] the communication that Congress sought to foster." *Harris*, 182 F.3d at 806-07. For example, "the plans and objectives of management for future operations" *see* 15 U.S.C. § 78u-5(i)(1)(B), usually rest on the company's present business condition, because the plan's existence typically implies that the company presently can execute on it. But the statement is

nonetheless protected under the provision's plain terms, because it ultimately concerns a future objective. Here, too, Harman's announcing a projection and a plan to achieve the projection ultimately concerns a future objective even if, as APERS wrongly claims, the announcement could be read to comment on Harman's current efforts to execute on the plan.

Implicitly recognizing the lack of support for its argument in the PSLRA's language, APERS cites a small number of non-binding district court opinions for the proposition that "mixed" current and future statements are actionable. APERS Br. at 14-15, 18-19. But, again, there is no "mixed" element; the "plan is proceeding" read in context means the plan for future sales is proceeding through the end of April, May and June.

In addition, none of the cited authority is on point. In *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702 (7th Cir. 2008), for example, the supposedly mixed statement was Tellabs' claim that its sales were "*still* going strong." *Id.* at 705 (emphasis supplied). The court held that the "still going" meant that "current sales were strong and that they would continue to be so." *Id.* at 705. Far from supporting APERS' argument, *Makor* proves why the statement here is different. Dr. Harman did not say "the plan is *still* proceeding" or make any similar express reference to a current condition.

His statement that the "plan is proceeding," particularly read in the context of end of April, May and June sales, has an entirely future focus.

Indeed, if anything, the Seventh Circuit's decision in *Makor* supports the Harman Defendant's argument by holding that the use of "the present tense is not decisive on the question whether the statements include predictions: 'Our earnings are certain to double' is in the present tense, but is a prediction." *Id.* Similarly, our "plan is proceeding" from now to June is a present progressive prediction.

The same is true of the statement at issue in *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1234-35 (S.D. Cal. 2010). There, the asserted misstatement was that an operational move from Finland to China that was mid-course "is proceeding *on plan*." *Id.* at 1234 (emphasis supplied). The inclusion of the phrase "on plan" used in the context of a mid-course transition meant that the transition was on "the established schedule," but it was not. *Id.* at 1235. The same is true of the statements at issue in *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000), in which the defendant said that the company was, as a current condition, "on track" to meet analyst estimates when it was not. Again, Dr. Harman was not talking about a current condition, but a *future* sales effort

27

and said merely that it is going forward in the coming months, not that a continuous sales effort was "on plan" or "on track."

The First Circuit's decision in *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005), is even further afield.  There, the alleged misstatement was that the company "has on hand . . . sufficient sources of funds to meet its anticipated [needs]."  *Id.*  The court acknowledged that "part of the statement that speaks of the quantity of cash on hand speaks of a present fact" and that the other part "speaks of a projection of future economic performance."  *Id.* at 212-13.  But it found the mixed nature of the statement of no moment, because the alleged fraud "d[id] not involve a contention that the defendants were underestimating the amount of their future cash needs.  The claim is rather that the defendants were lying about the Company's *present access* to funds."  *Id.* at 213 (emphasis supplied). "The Company was, according to the allegations of the Complaint, in an extreme liquidity crunch."  *Id.*  Here, in contrast, APERS is challenging whether then future sales effort would proceed as projected.

Finally, none of the cited decisions analyzes the safe harbor's "plan or objective" definition of "forward-looking" statements.  Given those courts'

28

deficient analysis, numerous others have rejected APERS' cited line of cases as inconsistent with the safe harbor's terms.[4]  This Court should as well.

### 3.    Mr. Brown's statement was forward looking.

Contrary to APERS' alternative claim, Mr. Brown's statement that the company was "bringing additional business on-stream," including its European PND business, was forward looking.  The statement provides "the assumptions underlying or relating" to a statement "containing a projection of revenues" within the meaning of the PSLRA's forward-looking statement definition.  15 U.S.C. § 78u-5(i)(1)(A), (D).  During the call, Mr. Brown stated that "[f]irst quarter fiscal '08 [total net] sales are *forecast* to be $950 million."  *Id.* at 4 (emphasis supplied).  He continued:  "[w]e expect [a]utomotive sales to increase approximately 15% during the quarter,

---

[4] *See, e.g.*, *Rochester Laborers Pension Fund v. Monsanto Co.*, 883 F. Supp. 2d 835, 853 (E.D. Mo. 2012) (finding statements that the company is "staying on [the] trajectory" of doubling gross profit and that the company is expecting to see increased gross profit "as its seeds and traits business grows" to be forward-looking); *Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No. 07-cv-1111, 2008 U.S. Dist. LEXIS 38899, at *33 (S.D. Cal. May 13, 2008) (unpublished) (finding that statement that FDA application was on track for approval was forward-looking); *In re Federal-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 565 (E.D. Mich. 2001) (finding statements that "management is proceeding with their … integration" and "the consolidation continues … as planned" would be deemed forward-looking); *In re Boeing Sec. Litig.*, 40 F. Supp. 2d 1160, 1168-69 (W.D. Wash. 1998) (finding statement that "progress continues to be made" to be forward-looking).

primarily due to the ramp-up of an infotainment system program and higher

PND sales in Europe"—both of which explain the future assumptions

underlying the projection.  *Id.*  Subsequently, an analyst observed that "the

$950 million of revenue expectation is [the] highest number you've ever

achieved" and asked whether that number was influenced by "the spillover

of [Mercedes] C Class revenues."  *Id.* at 6.  Mr. Brown responded:

> Yes, Peter, you are correct that that is a very strong
> first quarter on the top line for us, reflecting
> getting fully up the ramp curve on Mercedes C
> Class but also reflecting the fact that we are
> bringing additional business on-stream at Chrysler
> as we ramp up our Missouri plant and in the PND
> business, where we continue the growth and
> expansion of that business primarily in Europe.

*Id.*; Compl. ¶ 101.  The question to which Mr. Brown responded concerned

the assumptions underlying "the $950 million of revenue expectation,"

including what "influence[d] that number."  Will Decl., Exh. 18 at 4.  The

response provided the assumptions underlying the future revenue forecast.

Nothing more is required for forward-looking characterization under the

PSLRA's terms.

The forecast, moreover, was *right*.  Some months after the call,

Harman disclosed its *actual* first quarter FY2008 results.  As Mr. Brown

predicted, net sales were $947 million, an increase of 15% compared to first

quarter FY2007.  *See* Will Decl., Exh. 23 at 8; *id.* Exh. 29 at 4.

30

Despite the clear context, APERS wrongly argues (APERS Br. at 18-19) that Mr. Brown's statement was not forward-looking because "it is a present-tense statement" about the current quarter. But that argument ignores the reality that Mr. Brown was *forecasting* the first quarter results that were not finally announced until a few months later. *See* Will Decl., Exh. 8 at 4; *id.* Exh. 23 at 8; *id.* Exh. 29 at 4. And, contrary to APERS' claim, the present progressive is not limited to current fact, but can suggest a future action: *e.g.*, the team is arriving in two hours. For this reason, APERS' own cited authority, *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (cited at APERS Br. at 24), recognizes that "the present tense is not decisive on the question whether the statements include predictions." *Id.* Thus, Brown's verb tense does not prove current intent.

**B.    The Statements Were Accompanied By Meaningful Cautionary Language.**

Dr. Harman's and Mr. Brown's forward-looking statements were also accompanied by meaningful cautionary language. *See* 15 U.S.C. § 78u-5(c)(1)(A)(i). Under the PSLRA, cautionary language is "meaningful" if it identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* Cautionary statements must be substantive and tailored to the specific future projections.

31

*See In re XM Satellite Radio Holdings Sec. Litig.*,

479 F. Supp. 2d 165, 177 (D.D.C. 2007).  The PSLRA does not require,

however, an explanation of *all* potential risks, and the cautionary language

does not need to "explicitly mention *the* factor that ultimately belies a

forward-looking statement."  *Harris*, 182 F.3d at 807 (emphasis in original).

Rather, it is sufficient that "an investor has been warned of risks *of a*

*significance similar to that actually realized*" such that the investor can

make an informed decision according to his or her personal risk/reward

preferences.  *Id.* (emphasis supplied); *see also In re XM Satellite Radio*

*Holdings Sec. Litig.*, 479 F. Supp. 2d at 185; H.R. Conf. R. No. 104-369, at

44 (1995), 1995 U.S.C.C.A.N. 730, 743 ("failure to include the particular

factor that ultimately causes the forward-looking statement not to come true

will not mean that the statement is not protected by the safe harbor").

The Harman Defendants' numerous warnings about the European

PND market and the specific risks Harman's share price satisfy this

standard.  APERS' quick resort to Harman's supposed knowledge to

overcome these warnings is legally and factually unsound.

1.     **Dr. Harman's statement was accompanied by meaningful warnings about the European PND market.**

In connection with his statement that "[t]he plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and that plan is proceeding," Dr. Harman expressly stated that Harman had to work "extraordinarily hard" to increase sales and maintain its projected margins.  Will Decl., Exh. 8 at 7. He observed that "PND inventories in Europe had grown substantially," that "the European PND market ha[d] become extremely competitive," and that "because of higher competition, [the company was] seeing pricing pressure." *Id.* at 7, 14.  He also disclosed that the company had a PND inventory of approximately $50 million.  *Id.* at 7.

In addition, at the beginning of the call at issue, the moderator warned that the call would include forward-looking statements and directed listeners "to review the reports filed by Harman International with the Securities and Exchange Commission regarding the[] risks and uncertainties" underlying the statements.  Will Decl., Exh. 8 at 1.  In its then-most recent annual report, the 2006 Annual Report, Harman warned against its failure to "satisfy shifting consumer demand or compete successfully with competitors' products" and that "[d]elays or defects in new product introduction may result in loss of sales or delays in marketplace acceptance."

33

Will Decl., Exh. 26 at 31, 32.  It also warned that its markets were "highly competitive, rapidly changing and characterized by intense price competition." *Id.* at 32.  Harman explained that to increase sales and market share, it had to "improve existing products, while successfully developing new products" and constantly "respond to technological developments and changing consumer preferences." *Id.*

As the district court correctly found, Dr. Harman's and the report's warnings were meaningful because they "are not merely statements about general market risks, but are specific to the European PND market of which [APERS] complain[s]." D. Ct. Op. at 27-28.  "A reasonable investor would know that 'extreme' price pressure could substantially affect sales, margins, or both." *Id.*  In addition, the 2006 Annual Report specifically identified the risks from changing technology and consumer preferences.  Finally, Harman's historical fiscal year sales were disclosed during the call, allowing investors to evaluate for themselves whether Harman's projection was realistic.  *See id.* at 17.  Accordingly, the warnings were not mere boilerplate; they described the specific risks associated with the European PND market and the particular risks at issue here.

2.    **The same cautionary language adequately hedges Mr. Brown's statement.**

34

The same conclusion is appropriate for Mr. Brown's September 2007 statement.  At the beginning of the September analyst and investor call, the moderator warned listeners that the call would contain forward-looking statements that "include the Company's beliefs and expectations as to future events and trends affecting the Company's business and are subject to risks and uncertainties."  Will Decl., Exh. 18 at 1.  The moderator, again, advised listeners "to review the reports filed by Harman International with the Securities and Exchange Commission regarding those risks and uncertainties."  *Id.*  Like the 2006 Annual Report, Harman's then-most recent annual report (the 2007 Annual Report), warned that Harman's business is based on its "ability to introduce distinctive new products that anticipate changing consumer demands"; Harman sells its products in a "fragmented, highly competitive, rapidly changing" market "characterized by intense price competition"; and, "despite extensive testing, [Harman] may be unable to detect and correct defects in some of [its] products before [it] ship[s] them."  Will Decl., Exh. 1 at 23-24.  Moreover, Dr. Harman's and the 2006 Annual Report's previously-discussed warnings regarding the extremely competitive PND environment were available to the participants.  Considered together, the statements meaningfully warn about the rapidly changing PND market and intense price competition.  And, for all the

35

reasons the statements sufficiently warned of risk to the European PND market in the April 26 call, they were meaningfully cautionary in the September 27 call.

### 3.    APERS' contrary argument is wrong.

Despite the numerous warnings, APERS argues (APERS Br. at 19-23) that the cautionary language was not meaningfully tailored to the European PND risks.  Specifically, APERS claims (*id.* at 20) that "[o]ne of the major extant risks that threatened both predictions, however, was that Harman's inventoried products would not actually be saleable due to, among other things, obsolescence."  But Harman disclosed this risk, many times.

In both its 2006 and 2007 Annual Reports, Harman specifically warned that "[i]f we do not continue to develop, introduce and achieve market acceptance of new and enhanced products, our sales may decrease." Will Decl., Exh. 26 at 32; *id.* Exh. 1 at 24.  "In order to increase sales in current markets and gain entry into new markets, we must maintain and improve existing products, while successfully developing and introducing new products. . . . We may experience difficulties that delay or prevent the development, introduction or market acceptance of new or enhanced products."  *id.* Exh. 26 at 32; *id.* Exh. 1 at 24.  In addition, Harman warned that "[o]ur products may not satisfy shifting consumer demand or compete

36

successfully with competitors' products." *id*. Exh. 26 at 31; *id*. Exh. 1 at 23.

"If we fail to introduce new products, misinterpret consumer preferences or

fail to respond to changes in the marketplace, consumer demand for our

products could decrease and our brand image could suffer." *Id*.  It

continued:  "In addition, our competitors may introduce superior designs or

business strategies, impairing our distinctive image and our products'

desirability.  If any of these events occur, our sales could decline." *Id*.

Considered against Dr. Harman's particular warnings about the

competitive European PND market, the obsolescence risk was adequately

identified.  Again, Harman issued the above warnings against Dr. Harman's

particular warnings in the April 26 call that the PND market was "rapidly

changing," that Harman was "learning the challenges of the PND business,"

that the European PND market was "extremely competitive," and that

Harman was experiencing "margin pressures" due to the competition.  Will

Decl., Exh. 8 at 5, 7 & 14.  Dr. Harman also specifically disclosed that its

"PND inventories in Europe had grown substantially." *Id.* at 7.  All of these

warnings are sufficient to put investors on notice of an obsolescence risk, its

impact on sales, the risk of diminishing margins, sales and market share in

the European PND market, and Harman's growing European PND

inventory.  *See Harris*, 182 F.3d at 807.

37

APERS' claim (APERS Br. at 20-21) that Harman should have done more—that is, warn of an asserted *actual* inventory obsolescence—is wrong. To fall within the safe harbor Harman had only to warn of "*risks* of a significance similar to that actually realized," *Harris*, 182 F.3d at 807 (emphasis added), which as alleged here was a risk of reduced PND margins on sales due to purported obsolescence. It did so. In all events, this argument reduces to the claim that Harman's cautionary statements should be evaluated against what Harman allegedly knew about its inventory and pricing. APERS is effectively arguing that Harman's cautionary statements were not sufficiently specific in light of its alleged knowledge. But, as explained in the next section, that argument fails under the PSLRA.

### C. State Of Mind Should Not Be Considered Under The "Meaningful Cautionary Statement" Safe Harbor.

Apparently realizing that Dr. Harman's and Mr. Brown's statements were amply accompanied by meaningful cautionary language, APERS quickly collapses to the argument that whether the cautionary language was meaningful must be evaluated against the Harman Defendants' supposed knowledge—indeed, that premise underlies each of APERS' arguments. APERS Br. at 24-35. APERS' argument, however, is inconsistent with the PSLRA under every indicator of statutory interpretation: (i) the safe

38

harbor's terms, (ii) the PSLRA's other provisions, (iii) the safe harbor's legislative history, and (iv) the decisions of other courts.

*First*, whether the Harman Defendants' state of mind can be considered is answered, and rejected, by the safe harbor's plain language. Statutory interpretation "begins with the language of the statute itself." *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Fed. Elec. Comm'n*, 333 F.3d 168, 180 (D.C. Cir. 2003). When "the words of a statute are unambiguous," this "first canon is also the last." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254 (1992).

The PSLRA's forward-looking statement safe harbor provides that no liability can attach to a forward-looking statement where:

> (A) the forward-looking statement is—
>
>> (i) identified as a forward-looking statement, and accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or . . ."
>
>> (ii) immaterial . . .

15 U.S.C. § 78u-5(c)(1). By its terms, the statute contemplates an examination of only the language of the cautionary statement. The court is directed to examine whether the statements, themselves, "identify[]" important factors." *Id.* The safe harbor fails to identify any other factor,

such as the speaker's mental state or the speaker's purported knowledge as relevant to the analysis.

Section 78u-5's special procedure for dispositive motions confirms that the content of the cautionary language, itself, determines whether the warning is meaningful. The PSLRA provides that on "any motion to dismiss" based on the safe harbor, "the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement." 15 U.S.C. § 78u-5(e). By requiring the court to examine cautionary statements, the statute displaces Rule 12(b)(6)'s usual evidentiary limits. Notably, the provision does not expand Rule 12(b)(6) to allow for the consideration of knowledge evidence. Thus, the PSLRA indicates that a court will need *only* the complaint and any cautionary statement—not state of mind evidence—to evaluate a motion to dismiss.

*Second*, the PSLRA's structure confirms this interpretation. Immediately after the forward-looking statement safe harbor (quoted *supra* p. 39-40) the PSLRA continues:

> **or**
>
> (B) the plaintiff fails to prove that the forward-looking statement—
>
>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

40

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1) (emphasis supplied).  By using the disjunctive "or" between separately numbered provisions, the PSLRA creates *separate* safe harbors:  where the forward-looking statement "is accompanied by meaningful cautionary language, *or* it is immaterial, *or* the plaintiff fails to prove (or plead) that the issuer had actual knowledge that the statement was false or misleading when made."  D. Ct. Op. at 17 (internal citations omitted; emphasis in original).  *See United States v. Garcia*, 718 F.2d 1528 (11th Cir. 1983), *aff'd* 469 U.S. 70 (1984).

The presence of a separate safe harbor specifically relating to the defendant's state of mind is significant.  It shows both that Congress knew how to integrate knowledge into the safe harbors and that it failed to do so in the provision requiring meaningful cautionary statements.  And, "where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Gozlon-Peretz v. United States*, 498 U. S. 395, 404 (1991) (internal

41

quotation marks and citation omitted); *see also Custis v. United States*, 511 U.S. 485, 492 (1994) (same).

When combined with the PSLRA's evidentiary exception for cautionary statements, *see* 15 U.S.C. § 78u-5(e), the safe harbor's structure shows that Congress intended the different safe harbors to turn on different kinds of evidence.  A defendant can move to dismiss citing *either* the cautionary statements the PSLRA requires courts to consider under the (A)(i) safe harbor, *see* 15 U.S.C. § 78u-5(c)(1), *or* the complaint's inadequate state of mind allegations under the (B) exception, *see id.* (applying where "the plaintiff fails to prove").

If state of mind allegations were relevant to the "cautionary language" analysis, the (A)(i) safe harbor would never be available on a motion to dismiss.  As the district court correctly observed, a plaintiff will always plead knowledge of a statement's falsity "to block a defendant from invoking the subsection (B) safe harbor."  D. Ct. Op. at 21.  If the same allegations blocked the (A)(i) safe harbor for meaningful cautionary statements, the provision would have no function independent of the (B) provision.  Put another way:  if a defendant's "actual knowledge renders cautionary language meaningless as a matter of law, a defendant would never be able to avail himself of the subsection (A)(i) safe harbor at the

42

pleadings stage, and courts would never have occasion to apply the section

78u-5(e) mandate that courts consider cautionary language in ruling upon a

motion to dismiss." *Id.* at 21-22 (citing *Edward J. Goodman Life Income*,

594 F.3d at 796). A court, however, "should not construe the statute in a

manner that . . . would render a statutory term superfluous." *Dole Food Co.*

*v. Patrickson*, 538 U.S. 468, 476-77 (2003) (citing *United States v. Nordic*

*Village, Inc.*, 503 U.S. 30, 36 (1992), and *Mertens v. Hewitt Assocs.*, 508

U.S. 248, 258 (1993)).

   *Third*, the PLSRA's legislative history reinforces this conclusion. The

principal committee report describes the safe harbor provision as

"bifurcated" and observes that the first prong is "intended to provide a

standard for the types of cautionary statements upon which a court may,

where appropriate, decide a motion to dismiss, ***without*** *examining the state*

*of mind of the defendant*." H.R. Rep. No. 104-369, at 43-44 (1995),

*reprinted in* 1995 U.S.C.C.A.N. 730, 742 (emphasis supplied). No

statement of intent could be clearer.

   *Fourth*, "every circuit court to directly consider the issue has held that

the statutory text establishes a disjunctive test." D. Ct. Op. at 18 (citing

*Slayton v. American Express*, 604 F.3d 758, 766 (2d Cir. 2010); *Southland*

*Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 371-72 (5th Cir.

2004); *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2003); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010); *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783 (11th Cir. 2010)).

The Sixth, Ninth, and Eleventh Circuits, moreover, have held that the issuer's state of mind is irrelevant to whether his cautionary language is meaningful. *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 678 (6th Cir. 2003) ("[S]ince we conclude that the statements . . . were accompanied by meaningful cautionary language, the statements are subject to the safe harbor provisions of the PSLRA and are therefore not actionable. No investigation of defendant's state of mind is required."); *In re Cutera,* 610 F.3d at 1112 ("Under subsection (A)(i), . . . if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."); *Harris*, 182 F.3d at 803 ("[W]e need not in this case enter the thicket of the PSLRA's new pleading requirements for scienter; if a statement is accompanied by 'meaningful cautionary language,' the

defendant's state of mind is irrelevant.").  Accordingly, a majority of courts support the Harman Defendants' interpretation of the safe harbor.[5]

Unsurprisingly, in light of the PSLRA's text, structure and history, APERS conceded at oral argument before the district court that "both the statutory text and legislative history" support the Harman Defendants' interpretation of the safe harbor.  D. Ct. Op. at 17.  Nonetheless, it now argues that state of mind should be considered based on the *pre*-PSLRA common law "bespeaks caution" doctrine.  *See* APERS Br. at 24-32.  But the pre-PSLRA common law has been definitively replaced by the statutory safe harbor.  The safe harbor's terms, which APERS entirely ignores, make no reference to the "bespeaks caution" doctrine, and APERS provides no reason to conclude that Congress meant to silently import APERS' interpretation of the doctrine into the safe harbor.  *See Skilling v. United States*, 561 U.S. 358, 405 (2010) (explaining the linguistic cues that

---

[5]  The Seventh Circuit has held that meaningful cautionary language must, at a minimum, disclose "the major risks [the issuer] *objectively* faced" but has not adopted a subjective state of mind requirement.  *Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (emphasis supplied).  The Second Circuit has noted a tension between Congress's intent that courts examine only the cautionary statement's language and the courts' need to examine what the defendants knew "in order to determine what risks the defendants faced," but the Second Circuit has not resolved the tension, avoiding it instead by holding the cautionary language at issue insufficient on its face.  *Slayton*, 604 F.3d at 771-72.

Congress is presumed to use when it intends to codify a preexisting body of law, none of which are present here).

In any event, the bespeaks caution doctrine clearly *supports* the Harman Defendants' interpretation.  Between 1993 and 1995, most lower courts had adopted the "bespeaks caution" doctrine as defined in *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir. 1993).  That is, "cautionary language, if sufficient, renders the alleged . . . misrepresentations immaterial as a matter of law."  *See Saltzberg v. TM Sterling/Austin Assocs.*, 45 F.3d 399, 400 (11th Cir. 1995).  Under *Trump*, the bespeaks caution doctrine protects statements which "reflect hope, adequately tinged with caution, [where] the total mix of information available to the market cannot reasonably be found to be misleading." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 811 (2d Cir. 1996); *see also In re Baan Sec. Litig*, 103 F. Supp. 2d 1, 12-13 (D.D.C. 2000) (dismissing complaint and holding that "general, positive, . . . forward looking comments" concerning the defendant corporation's "strong" and "continued" growth and sound business strategy were insufficient to support a claim under § 10(b)).  "The fact that [a] company's performance did not conform to that predicted supports no inference that [the company's] statements lacked a reasonable

46

basis when made." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). No inquiry into state of mind was required.

Congress passed the safe harbor against this background, and unsurprisingly, the widespread judicial acceptance of the Third Circuit's rule in *Trump* motivated the statutory safe harbor. *See* S. REP NO. 104-98, at [17] (1995). While APERS takes issue with the Third Circuit's reasoning in *Trump* (APERS Br. at 27-32), its personal dispute with the court of appeals' reasoning does not inform the PSLRA's meaning. Right or wrong, *Trump* was widely accepted as the correct governing law when the PSLRA was passed, and Congress drafted the safe harbor to conform with the case—not APERS' brief.

APERS' alternative argument that the legislative history is "inconclusive" (APERS Br. at 32-33) is similarly unpersuasive. The legislative history speaks for itself, and bolsters the PSLRA's clear text and structure. In all events, whether inconclusive or not, the legislative history provides APERS *no* support whatsoever. Thus, APERS can point to **none** of the usual indicators of statutory meaning to support its interpretation of the safe harbor.

Finally, APERS wrongly claims (APERS Br. at 33-35) that considering a defendant's state of mind does not render the safe harbor itself,

47

or the dispositive-motion provision of § 78u-5(e) "meaningless."  In

APERS' view, a defendant can still avail itself of the (A)(i) safe harbor on a

motion to dismiss by proving its knowledge or by proving that it warned

about everything it knew.  (APERS Br. at 34-35).  But APERS ignores that a

defendant cannot introduce evidence of its knowledge at the motion to

dismiss stage; the PSLRA's evidentiary exception extends only to cautionary

statements.  *See* 15 U.S.C. § 78u-5(e).  Thus, a plaintiff can always plead

around any cautionary statement by alleging a heightened level of

knowledge.  And, since knowledge is frequently a disputed fact, the

applicability of any safe harbor would likely have to await trial.  This would

ruin the purpose of the pleading-stage safe harbor and do so in violation of

the interpretive mandate to give each provision meaning.  *See Dole Food*

*Co.*, 538 U.S. at 476-77 (courts "should not construe the statute in a manner

that is strained and, at the same time, would render a statutory term

superfluous").

   Accordingly, APERS' state of mind argument is disproved simply by

"heed[ing] Professor Frankfurter's timeless advice: '(1) Read the statute; (2)

read the statute; (3) read the statute!'" *Kellmer v. Raines*, 674 F.3d 848, 850

(D.C. Cir. 2012) (quoting Henry J. Friendly, *Mr. Justice Frankfurter and the*

*Reading of Statutes, in* Benchmarks 196, 202 (1967)). Presumably for this reason, APERS makes no mention of it.

### D. APERS' State Of Mind Argument Fails As A Factual Matter.

While this Court does not need to decide the issue to affirm the district court, APERS' assertion that the Harman Defendants' actual knowledge rendered the cautionary statements non-meaningful (APERS BR. at 24-25) is wrong. APERS has utterly failed to demonstrate actual knowledge of falsity with respect to the alleged misstatements.[6]

With respect to the Harman Defendants' purported knowledge of PND obsolescence, APERS relies on the statements of an anonymous former sales engineer and an anonymous former accounting manager, and undefined "operational reports." *See* APERS Br. 5-7; Compl. ¶¶ 52-55. On the face of the Complaint, however, none supports APERS' knowledge claim because they all concern PND sales in ***a different time period***.

---

[6] The district court declined to decide whether APERS adequately pled scienter with respect to the PND statements but suggested in a footnote that APERS might have a "strong [scienter] argument." (D. Ct. Op. at n. 13). Harman strongly disagrees with the district court's suggestion. This Court, however, need not consider the district court's view of scienter. In its footnote *dicta*, the district court did *not* decide whether the Harman Defendants had *actual knowledge* rendering their cautionary statements non-meaningful. That is the question here, and there is no factual basis whatsoever for an "actual knowledge" claim.

49

APERS' loss causation theory is based on missed PND sales forecasts for *the second quarter of FY2008*; the cited sources describe purported knowledge of lackluster PND sales during the *fourth quarter of FY2007*. *See* APERS Br. 24-25; Compl. ¶ 113. APERS does not allege knowledge during relevant period, because it cannot. The Complaint states that APERS' inside sources *were no longer at Harman* during the relevant period. *See* Compl. ¶ 52 (sales engineer left in July 2007); *id.* ¶ 54 (observing that Accounting Manager left in "late 2007").

Indeed, if anything, the cited Accounting Manager's statements **contradict** APERS' knowledge claim. This confidential informant states that in July 2007, it looked like Harman had turned a corner and was starting to sell significant numbers of PNDs. Compl. ¶ 54. This admission affirmatively disproves knowledge during the relevant period; it demonstrates that Harman would not have had actual knowledge that FY2008 PND sales would prove to be challenging and margin pressured. And, when Harman's previously reasonable projection for 2008 proved high, it timely disclosed its second quarter FY2008 results in February 2008.

APERS' claim that the Harman Defendants obtained knowledge about PNDs by reviewing "operating reports" (Compl. ¶¶ 55, 56) is no better. APERS fails to identify any information about the internal reports, *i.e.*, who

50

prepared them, who received them, how firm the numbers were within them, how they were distributed, or to whom they were distributed, and does not allege that any of the *individual defendants* received and reviewed the internal reports.  These omissions render allegations about the reports irrelevant and unreliable as a matter of law.  *See, e.g.*, *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies*, 75 F.3d 801, 812-13 (2d Cir. 1996) ("Plaintiffs' unsupported general claim of the existence of confidential company sales reports that revealed the larger decline in sales is insufficient to survive a motion to dismiss"); *Arazie v. Mullane*, 2 F.3d 1456, 1467 (7th Cir. 1993) ("[R]eferences to unreleased or internal information that allegedly contradict [s] [defendants'] public statements" should indicate such matters as "who prepared the projected figures, when they were prepared, how firm the numbers were, or which [company] officers reviewed them.").  Accordingly, even if this Court were to consider the Harman Defendants' purported knowledge to evaluate whether their cautionary statements were meaningful, it would still conclude that the safe harbor applies.

## II.     HARMAN'S CHARACTERIZATION OF HISTORICAL SALES FIGURES AS "STRONG" IS INACTIONABLE PUFFERY.

APERS' alternative argument—that Harman's 2007 Annual Report was false and misleading in stating that its aftermarket part sales "were very strong" during FY2007—fares no better.

### A.     Harman's "Very Strong" Statement Is Vague And Incapable of Verification.

To be actionable under the securities laws, a statement must be material—that is, viewed by a reasonable investor as "having significantly altered the total mix of information made available" to the market.  *Basic, Inc. v. Levison*, 485 U.S. 224, 231-32 (1988).  Statements that are "no more than 'puffery,'" or "too general to cause a reasonable investor to rely upon them," do not "give rise to securities violations."  *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see also In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 176 (D.D.C. 2007) ("under the 'puffery' doctrine, . . . 'generalized statements of optimism that are not capable of objective verification' are not actionable 'because reasonable investors do not rely on them in making investment decisions.'") (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

52

Harman's characterization of its 2007 sales as "strong" is immaterial puffery under this standard. Puffery's hallmark is the lack of "a standard against which a reasonable investor could expect them to be pegged." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). That is true of Harman's "very strong" PND sales statement. The reader does not know whether "very strong" is relative to Harman's historical sales, Harman's expectations, Harman's budget, competitors' sales over the period, competitors' historical sales, or something different entirely. And, as the district court held, if Harman meant to compare its PND sales to previous quarters, its statement was true. D. Ct. Op. at 36.

Thus, the district court correctly concluded that Harman's "use of the chest-beating adjective 'strong' is subjective and provides no standard against which a comparison can be drawn." *Id*. The term was used in such a vague manner, "it is impossible to know" what very strong was meant to connote. *Id.* Indeed, Harman's characterization is no different from a statement that "business remained strong," which has been held too "vague and amorphous" to be actionable. *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868 (N.D. Cal. 2004). And, it is no different from a statement that a company's demand was "strong," which is a "vague assessment[] of past results, on which no reasonable investor would rely." *In re Splash*

*Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1077 (N.D. Cal. 2001).

Harman's use of the adjective "very" before "strong" does not alter the analysis. As this Court has explained, "the use of a particular pejorative adjective will not alter the total mix of information available to the investing public." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) (internal citations omitted). The same is true of a flattering adjective.

Harman's disclosure of the actual sales results separately renders the "very strong" statement immaterial. The overall sales figures were reported just prior to the "very strong" statement. Will Decl., Exh. 1 at 38-39; *id.* Exh. 8 at 7, 17. The investor was free to examine that information and Harman's past disclosures to evaluate, for itself, Harman's statement. Harman's puffery added nothing to this evaluation. *See In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d at 176.

**B.     APERS' Contrary Argument Ignores The Statement's Inherent Vagueness.**

In response, APERS argues (APERS Br. at 36-38) that Harman's puffery is nonetheless actionable because the company allegedly knew that Harman's PND sales were lower than projected, that it was supposedly experiencing pricing pressure on the PND units, and that the PNDs were

54

purportedly sitting in inventory.  But these allegations do not alter the fact that Harman's "very strong" language is too vague to be material.  If Harman was judging its sales against competitors or if these pressures were industry wide, none of these alleged factors would render the statement material.

In addition, Harman's statement related to the very *historical* sales it was reporting.  Whether, as APERS argues, pricing pressures and increasing inventories could impact future sales does not render Harman's characterization of its past sales inaccurate.  Harman had disclosed its PND sales from the third quarter of FY2007 to that point, as well as its projections.  Will Decl., Exh. 8 at 16-17.  From this data and the annual report's disclosures (*see id.* Exh. 1, 26), investors had the ability to independently evaluate the strength of Harman's sales without relying upon Harman's characterization.

Finally, APERS' argument is effectively that the "very strong" statement was *false*, but that issue is a separate from whether the statement was *material*.  Not all false statements are actionable under securities laws; the materiality doctrine exists "to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976).

55

Accordingly, the district court correctly concluded that Harman's characterization of its sales figures as "strong" did not deprive investors of an informed choice, meaning the statement is not actionable regardless of its truth or falsity.

## III.    APERS FAILED TO ADEQUATELY PLEAD LOSS CAUSATION.

Regardless of the safe harbor's applicability, the judgment should be affirmed on the independent ground that APERS has not adequately alleged loss causation. *See Carney v. American University*, 151 F.3d 1090, 1096 (D.C. Cir. 1998) (appellate court may affirm on any basis supported by the record). The U.S. Supreme Court has long required that a § 10(b) plaintiff "prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This loss causation requirement was firmly established at common law, *see Pasley v. Freeman*, 100 Eng. Rep. 450, 457 (1789), and is now codified in the securities laws, 15 U.S.C. § 78u-4(b)(4) (the plaintiff must prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages").

To satisfy this requirement, the plaintiff must allege that the falsity was revealed before the stock price dropped *and* that a corrective

disclosure—as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events"—was *the reason* for a subsequent drop. *Dura*, 544 U.S. at 343. It is insufficient to claim that a stock's price was "artificially inflated" because of a misrepresentation and then declined after the misrepresentation was corrected; "the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss." *Id*.

APERS does not satisfy this standard. With respect to PNDs and the January and February 2008 declines in Harman's share price, APERS asserts that Harman's failure to meet its PND sales projections caused its loss. *See* Compl. ¶¶ 133-35. But, the announcement of a failed projection cannot establish loss causation as a matter of law. "If downturns in stock prices based on such mundane events as failures to meet forecasts and downward revisions of forecasts were legally sufficient to constitute disclosures of securities fraud, then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed and that the disclosure caused their losses." *In re Initial Public Offering Sec. Litig.* ("*In re IPO I*"), 399 F. Supp. 2d 261, 266-67 (S.D.N.Y. 2005). While the "failure to meet earnings forecasts may have

a negative effect on stock prices," that does not automatically make it a

"corrective effect." *Id.* at 266 (stating that the failure to meet earnings

forecasts or statements foreshadowing such failures do not constitute events

disclosing schemes to defraud the market).  Rather, to establish loss

causation, the loss must be caused by the "materialization of the concealed

risk," and a missed projection is not necessarily the same as the concealed

risk.  *Lentell*, 396 F.3d 173 (emphasis supplied); *see Garber v. Legg Mason,*

*Inc.*, 537 F. Supp. 2d 597, 616 (S.D.N.Y. 2008) (if "the connection is

attenuated, or if the plaintiff fails to demonstrate a causal connection

between the content of the alleged misstatements or omissions and the harm

actually suffered, a fraud claim will not lie.").

Here, Harman repeatedly warned of its PND inventory levels, its

increasingly pressured PND margins in Europe and the competitive

pressures in the European PND market, and it advised investors that its

projections were not a guarantee of actual results in light of these risks.  *See*

*supra* pp. 3-8; *see also* Will Decl., Exh. 1 at 32 (cautioning investors that

"[a]utomotive inventories increased *significantly* due to our entry into the

PND market in fiscal 2007") (emphasis supplied).  Thus, "substantial indicia

of the risk that materialized [we]re unambiguously apparent on the face of

the disclosures alleged to conceal the very same risk." *Lentell*, 396 F.3d at 177.

In any event, the Complaint, on its face, identifies so many alternative reasons for APERS' share price drop that APERS cannot prove loss causation as a matter of law. As the U.S. Supreme Court has recognized, market conditions can make causation legally intractable; a security's "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharmaceuticals*, 544 U.S. at 343; *see also Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008). "In a securities case, [loss causation] requires the plaintiff to show that the defendant's fraud—and not other events—caused the security's drop in price." *Schaaf*, 517 F.3d at 550. Where "there are a tangle of factors that affect [share price], evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013). Accordingly, where a plaintiff's "theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss

59

attributable to non-fraud related news and events," loss causation cannot be proved as a matter of law. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009).

Here, APERS' Complaint *on its face* identifies a tangle of factors that make causation impossible to discern. For example, APERS alleges that the bulk of the reduction in Harman's share priced occurred due to disclosures about a failed merger and significantly increased R&D costs relating to non-PND products—neither of which is at issue here. *See* Compl. ¶¶ 92-108. With respect to the January 14, 2008 press release APERS now claims (APERS Br. at 8) caused its loss, APERS alleged in its Complaint that the release's disclosure of "higher than planned R&D engineering and material costs," again unrelated to European PNDs, impacted Harman's share price.

Similarly, in its Complaint, APERS alleges that the February 5, 2008 press release it now cites (APERS Br. at 9) caused a stock drop by disclosing that Harman's earnings were under pressure due, not merely to PND sales, but to "product mix change, including higher sales of lower-margin infotainment systems for mid-level vehicles; and higher than expected material costs"—which were unrelated to PNDs. *See* Compl. ¶ 112; *see also* Will Decl., Exh. 21 at 1 (calling the quarter "a period of record launch activity"); *id.* at 3 (observing that margin decline was attributable to "lower

60

margins on PND, product mix and material costs" and that operating income declined "due to gross margin effects, higher engineering and other SG&A"). And, APERS alleges in its Complaint that the February 11, 2008 post-class period disclosure on which APERS relies (APERS Br. at 10) disclosed that Harman's "mid-level infotainment system for Chrysler . . . was unprofitable." Compl. ¶ 116. Accordingly, on its face, APERS' Complaint undercuts any argument that Harman's disclosure of missed PND sales projections caused its asserted loss.

Having narrowed its appeal to only three statements, APERS is required to explain, but in light of its allegation cannot explain, the relationship between corrective disclosures regarding PND sales and any economic loss. For that independent reason, the judgment below should be affirmed.

## IV. PLAINTIFF'S § 20(A) CLAIM SHOULD BE DISMISSED GIVEN THE ABSENCE OF ANY PRIMARY VIOLATION OF § 10(B) OR RULE 10B-5.

Because the Complaint fails to allege a primary violation of section 10(b), APERS' control-person claims against the individual defendants (Compl. ¶¶ 184-86) fail as a matter of law. Section 20(a) imposes liability on one who controls a "person liable under any provision of" the securities laws. 15 U.S.C. § 78t(a). Accordingly, a plaintiff must "show a primary

violation by the controlled person" to "establish a prima facie case" under

this section.  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.

1996); *see also SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1170-71 (D.C.

Cir. 1978) (a district court must make "an express finding as to primary

liability," because "a finding of liability via control" is "a finding of

secondary liability").  "[T]here can be no control person liability without a

primary violation by the person allegedly controlled."  *Republic Property*

*Trust v. Republic Properties Corp.*, 540 F. Supp. 2d 144, 163 (D.D.C. 2008)

(citing 15 U.S.C. § 78t(a) (2008)); *see also In re Fed. Nat'l Mortgage Ass'n*

*Sec. Deriv. and "ERISA" Litig. ("Fannie Mae")*, 503 F. Supp. 2d 25, 44

(D.D.C. 2007) (concluding that section 20(a) liability can only exist where

plaintiffs allege that individuals culpably participated in securities fraud).

     In all events, § 20(a) liability cannot attach unless the alleged control

person "culpably participated" in the underlying fraud. *Id.*, at 44 (requiring

plaintiffs to plead "particularized facts of [the controlling person's]

conscious misbehavior as a culpable participant in the fraud") (quoting

*Mishkin v. Ageloff*, No. 97-cv-2690, 1998 U.S. Dist. LEXIS 14890, at *63

(S.D.N.Y. Sept. 23, 1998)); *see also SEC v. J.W. Barclay & Co.,* 442 F.3d

834, 841 (3d Cir. 2006); *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1472

(2d Cir. 1996.  Here, too, the heightened pleading requirements of the

62

PSLRA require a plaintiff to plead "culpable participation" with particularity. *See Fannie Mae*, 503 F. Supp. 2d at 44 (citing *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973)).  Corporate directors cannot be liable based on their job titles alone: reckless conduct or conscious misbehavior is necessary.  *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 (1976) (noting that § 20(a) liability requires more than showing of mere negligence).

The Complaint, however, makes no such allegations.  APERS relies (APERS Br. at 39) only on the fact that they had "high-level positions," (Compl. ¶ 184) and "supervisory involvement in the day-to-day operations of the Company."  Compl. ¶ 185.  The presumption of control that APERS draws from the positions "make[s] a mockery of Congress's intent in passing the PSLRA" because the inference is not supported by specific allegations of malfeasance.  *Fannie Mae*, 503 F. Supp. 2d at 44.  Accordingly, the Court should dismiss the Complaint's Second Claim.

## CONCLUSION

The judgment of the district court should be affirmed.

Respectfully submitted.

**/s/ Traci L. Lovitt**
JONES DAY

Thomas F. Cullen, Jr.
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Email: tfcullen@jonesday.com
Tel: (202) 879-3939
Fax: (202) 626-1700

Robert C. Micheletto
Kelly A. Carrero
Ian Samuel
222 East 41st Street
New York, New York 10017
Email: rmicheletto@jonesday.com
Email: kacarrero@jonesday.com
Email: isamuel@jonesday.com
Tel: (212) 326-3939
Fax: (212) 755-7306

Traci L. Lovitt
100 High Street, 21st Floor
Boston, Massachusetts 02110
Email: tlovit@jonesday.com
Tel: (617) 960-3939
Fax: (617) 449-6999

*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 29(d) and Fed. R. App. P. 32(a)(7)(B) because it contains 13,597 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and D.C. Cir. R. 32(a)(1), as counted using the word-count function on Microsoft Word 2007 software.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

Dated: August 11, 2014                         **/s/ Traci L. Lovitt**
                                               Traci L. Lovitt

## CERTIFICATE OF SERVICE

I hereby certify that, on August 11, 2014, I electronically filed a true

and correct copy of the foregoing using the CM/ECF system, which will

send notification of such filing to all counsel of record.

JONES DAY

**/s/ Traci L. Lovitt**
100 High Street, 21st Floor
Boston, Massachusetts 02110
Email: tlovit@jonesday.com
Tel: (617) 960-3939
Fax: (617) 449-6999