**RECORD NO. 14-7017**

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

In The

# United States Court of Appeals
### For The District of Columbia Circuit

## IN RE: HARMAN INTERNATIONAL INDUSTRIES, INC. SECURITIES LITIGATION

-------------------------------------------------------------------------------------------------------------------------

## ARKANSAS PUBLIC EMPLOYEES' RETIREMENT SYSTEM,
**Individually and on Behalf of All Others Similarly Situated,**

*Plaintiff – Appellant*,

## CHEOLAN KIM; CITY OF BOCA RATON GENERAL EMPLOYEES PENSION PLAN,
**on Behalf of Itself and All Others Similarly Situated,**

*Plaintiffs – Appellees*,

**v.**

## HARMAN INTERNATIONAL INDUSTRIES, INC.; DR. SIDNEY HARMAN; KEVIN BROWN; SANDRA B. ROBINSON; DINESH PALIWAL,

*Defendants – Appellees*.

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

_____

### BRIEF OF APPELLANT
_____

Steven J. Toll
Daniel S. Sommers
S. Douglas Bunch
Times Wang
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue, NW, Suite 500 West
Washington, DC 20005
(202) 408-4600

*Counsel for Plaintiff – Appellant*
  *Arkansas Public Employees' Retirement System*          *Dated: September 29, 2014*

**THE LEX GROUP**DC ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to D.C. Circuit Rule 28(a)(1):

A.  **Parties and Amici**

1.  *Appellant*

Arkansas Public Employees' Retirement System

2.  *Appellees*

Harman International Industries, Inc.

Sidney Harman

Dinesh Paliwal

Kevin Brown

B.  **Rulings Under Review**

This appeal challenges the U.S. District Court for the District of Columbia's ruling in *In re Harman International Industries, Inc. Securities Litigation*, CV 07-1757(RC), 2014 WL 197919 (D.D.C. Jan. 17, 2014).

C.  **Related Cases**

The case under review has never been before this Court. Counsel is not aware of any related cases currently pending in any other court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ...................................................................i

TABLE OF CONTENTS.................................................................ii

TABLE OF AUTHORITIES ...........................................................iv

GLOSSARY OF ABBREVIATIONS ...........................................viii

JURISDICTIONAL STATEMENT ...............................................1

STATEMENT OF ISSUES ..............................................................1

STATUTES AND REGULATIONS ...............................................2

STATEMENT OF THE CASE...........................................................2

    I.     NATURE OF ACTION AND PROCEDURAL HISTORY..................2

    II.    STATEMENT OF FACTS ...........................................4

        A.    Harman's Personal/Portable Navigation Devices...........................4

        B.    The Class Period.................................................5

        C.    Harman Reveals the Truth about Its PND Business ......................8

        D.    Post-Class Period Disclosures...........................................10

SUMMARY OF ARGUMENT.........................................................11

STANDARD OF REVIEW ...........................................................12

ARGUMENT ...............................................................................12

    I.     LEAD PLAINTIFF HAS ADEQUATELY STATED A CLAIM
        UNDER SECTION 10(b) ...........................................................12

A.     Defendants' Statements about the Status of the Company's European PND Business Are Not Entitled to Safe Harbor Protection ........................................................................................14

      1.     Defendants' Statements about the Company's European PND Business Were Not Forward-Looking ...............................................................................14

      2.     Even If the Statements at Issue Are Forward-Looking, They Were Not Accompanied by Meaningful Cautionary Language, and Are Thus Actionable ...............................................................20

      3.     Whether Cautionary Language Is Meaningful Should Be Informed by Defendants' State of Mind........................24

           a.     Treatment of Forward-Looking Statements Before the PSLRA ........................................................26

           b.     The Legislative History Is Inconclusive ...................32

           c.     Considering State of Mind Does Not Render Subsection (A)(i) Meaningless ...................................34

B.     Harman's Statement That Sales of PNDs Were "Very Strong During Fiscal 2007" Were Not Mere Puffery...................36

II.     LEAD PLAINTIFF HAS ADEQUATELY STATED A CLAIM UNDER SECTION 20(a) ...........................................................39

CONCLUSION ....................................................................................40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ...................................................................12

*Asher v. Baxter Int'l Inc.,*
  377 F.3d 727 (7th Cir. 2004) ..................................................33

*Atherton v. D.C. Office of Mayor,*
  567 F.3d 672 (D.C. Cir. 2009) ...............................................12

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................12

*\*Brattain v. Alcitepe,*
  934 F. Supp. 2d 119 (D.D.C. 2013) ...................................12-13

*\*Burman v. Phoenix Worldwide Indus., Inc.,*
  384 F. Supp. 2d 316 (D.D.C. 2005) ...................................14, 19

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,*
  594 F.3d 783 (11th Cir. 2010) ...............................................34

*\*Freeland v. Iridium World Commc'ns, Ltd.,*
  545 F. Supp. 2d 59 (D.D.C. 2008) .........................................35

*Howard v. Office of Chief Admin. Officer of U.S. House of Representatives,*
  720 F.3d 939 (D.C. Cir. 2013) ...............................................12

*\*Huddleston v. Herman & MacLean,*
  640 F.2d 534 (5th Cir. 1981), *aff'd in part, rev'd in part,*
  459 U.S. 375 (1983) .........................................................25, 29

*\*Chief Authorities are Designated by an Asterisk.*

*I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*,
    936 F.2d 759 (2d Cir.1991)...................................................................29

*In re Alpharma Inc. Sec. Litig.*,
    372 F.3d 137 (3d Cir. 2004) ..............................................................39

*\*In re Computer Assocs. Class Action Sec. Litig.*,
    75 F. Supp. 2d 68 (E.D.N.Y. 1999) ...................................................37

*\*In re Convergent Techs. Sec. Litig.*,
    948 F.2d 507 (9th Cir. 1991) ..............................................................29

*\*In re Copper Mountain Sec. Litig.*,
    311 F. Supp. 2d 857 (N.D. Cal. 2004) ..............................................15

*\*In re Donald J. Trump Casino Sec. Litig.*,
    7 F.3d 357 (3d Cir. 1993)..............................................20, 27, 28, 29, 30, 31, 32

*\*In re Dura Pharm., Inc. Sec. Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) .......................................36, 37, 38

*\*In re EVCI Colleges Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) .................................................25

*\*In re Lucent Techs., Inc. Sec. Litig.*,
    217 F. Supp. 2d 529 (D.N.J. 2002)....................................................37

*\*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998)..............................................15, 18

*\*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
    930 F. Supp. 68 (S.D.N.Y. 1996)......................................................25

*\*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) ......................................15, 18

*\*In re Secure Computing Corp. Sec. Litig.*,
    120 F. Supp. 2d 810 (N.D. Cal. 2000) ......................................15, 16

*In re Stone & Webster, Inc. Sec. Litig.*,
    414 F.3d 187 (1st Cir. 2005)..............................................................14

v

*In re Unicapital Corp. Sec. Litig.*,
    149 F. Supp. 2d 1353 (S.D. Fla. 2001)....................................................................24

*In re ValuJet, Inc. Sec. Litig.*,
    984 F. Supp. 1472 (N.D. Ga. 1997) .....................................................................15

*\*In re XM Satellite Radio Holdings Sec. Litig.*,
    479 F. Supp. 2d 165 (D.D.C. 2007) ................................... 19, 20, 23, 27, 36

*Janus Capital Grp., Inc. v. First Derivative Traders*,
    ---- U.S. ----, 131 S. Ct. 2296 (2011) .................................................................13

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) .................................................................................14

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..................................................................................13

*Polin v. Conductron Corp.*,
    552 F.2d 797 (8th Cir. 1977), *cert. denied*,
    34 U.S. 857 (1977) ................................................................................................29

*\*Romani v. Shearson Lehman Hutton*,
    929 F.2d 875 (1st Cir. 1991).................................................................................28

*S. Ferry LP # 2 v. Killinger*,
    399 F. Supp. 2d 1121 (W.D. Wash. 2005), *vacated on other grounds*,
    542 F.3d 776 (9th Cir. 2008) .................................................................................19

*\*Sinay v. Lamson & Sessions Co.*,
    948 F.2d 1037 (6th Cir. 1991) ...............................................................................28

*\*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................... 24, 33

*\*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) ...................................................................... 20, 23

*Stevens v. InPhonic, Inc.*,
    662 F. Supp. 2d 105 (D.D.C. 2009) .....................................................................39

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..................................................................... 12, 23

*U.S. Sec. & Exch. Comm'n v. e-Smart Techs., Inc.,*
    No. 11-cv-895, 2014 WL 945816 (D.D.C. Mar. 12, 2014) ....................................14

*Virginia Bankshares v. Sandberg,*
    501 U.S. 1083 (1991) .............................................. 30, 31, 32, 36, 38-39

## STATUTES

15 U.S.C. § 78aa ...........................................................................................1

15 U.S.C. § 78j(b) ...............................................................................2, 12, 40

15 U.S.C. § 78t(a) ..............................................................................2, 11, 12, 39

15 U.S.C. § 78u-5 ....................................................................................... 1, 11

15 U.S.C. § 78u-5(e) ..............................................................................26, 34, 36

15 U.S.C. § 78u-5(c)(1)(B) .............................................................................34

28 U.S.C. § 1291 .........................................................................................1

28 U.S.C. § 1331 .........................................................................................1

## RULES

Fed. R. Civ. P. 12(b)(6) ...............................................................................2, 27

SEC Rule 10b-5 ......................................................................................2, 12, 24

## OTHER AUTHORITY

Harman International Industries 2008 Annual Report (Form 10-K),
*available at* http://investor.harman.com/common/download/download.cfm?
companyid=HAR&fileid=383016&filekey=010B2CA8-08F6-4D13-914B-
20ECE328CE0D&filename=hii-2008.pdf (last accessed June 5, 2014).........................24

## GLOSSARY OF ABBREVIATIONS

PND – Personal/Portable Navigation Device[1]

PSLRA – Private Securities Litigation Reform Act

---

[1] Both terms—"Personal Navigation Device" and "Portable Navigation Device"—were used interchangeably by Defendants.  Thus, Lead Plaintiff uses both terms as well.

## JURISDICTIONAL STATEMENT

Plaintiffs appeal from a final order by the Honorable Rudolph Contreras of the United States District Court for the District of Columbia (the "District Court"), granting Defendants'[1] motions to dismiss.  The District Court had subject matter jurisdiction pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

On February 18, 2014, a notice of appeal was timely filed with the District Court.

This appeal is from a final judgment that disposes of all parties' claims.

## STATEMENT OF ISSUES

1.    Whether Harman's statements with regard to its Personal/Portable Navigation Devices ("PNDs") are entitled to the protection of the safe harbor for forward-looking statements under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-5.

2.    Whether Harman's statement characterizing its sales of PNDs as "very strong," when Harman had knowledge to the contrary, is actionable.

---

[1] The Defendants in this case are Harman International Industries, Inc. ("Harman" or the "Company"); the founder and former CEO of Harman, Dr. Sidney Harman ("Dr. Harman"); the CEO and President of Harman, Dinesh Paliwal ("Paliwal"); and the CFO of Harman, Kevin Brown ("Brown").  Dr. Harman, Paliwal, and Brown are collectively the "Individual Defendants."

3.    Whether the Complaint adequately alleges a violation of Section 20(a) of the

Exchange Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addendum.

## STATEMENT OF THE CASE

## I.    NATURE OF ACTION AND PROCEDURAL HISTORY

This is a securities class action brought on behalf of persons who purchased

Harman common stock during the period between April 26, 2007 and February 5,

2008, inclusive (the "Class Period").  The claims arise under Sections 10(b) and 20(a)

of the Exchange Act, and Rule 10b-5 promulgated thereunder.

The original complaint was filed on October 1, 2007, D.I. 1,[2] and the

Consolidated Complaint ("Complaint") was filed on May 2, 2008.  D.I. 20 (Joint

Appendix 14) ("J.A.").  Defendants filed their Motion to Dismiss, pursuant to Fed. R.

Civ. P. 12(b)(6), two months later, on July 3, 2008.  D.I. 21 ( J.A. 86) ("Motion to

Dismiss").  Lead Plaintiff filed its opposition on September 2, 2008.  D.I. 26 (J.A.

476).  Defendants filed a reply on October 2, 2008.  D.I. 27.

Following that filing, aside from various notices of supplemental authorities

and responses thereto, a motion filed by Lead Plaintiff for a hearing, and various

other administrative motions, the case lay dormant for nearly four years, when it was

---

[2] D.I. followed by a number indicates the docket number assigned to the document on the District Court's docket sheet.  If a document has an attachment, it is designated by a hyphen.

reassigned to Judge Rudolph Contreras. D.I. 42. A hearing was held on Defendants'
Motion to Dismiss on September 5, 2012. More than a year later, on January 17, 2014
– and more than five years after Defendants filed their Motion to Dismiss – the
District Court granted Defendants' Motion, dismissing Lead Plaintiff's claims in their
entirety. D.I. 57 (J.A. 523) ("Mem. Op."). This appeal followed.

On appeal, Lead Plaintiff challenges the District Court's holdings as to the
following three statements:

- Dr. Harman's April 26, 2007 statement that "[t]he plan forecasts total
  unit sales of 618,000 units for the fiscal '07 year, and that plan is
  proceeding." ¶ 57 (J.A. 32).

- Harman's August 29, 2007 statement that "[s]ales of aftermarket
  products, particularly PNDs, were very strong during fiscal 2007."
  ¶¶ 82, 86 (J.A. 46-48).

- Brown's September 27, 2007 statement that Harman's strong first
  quarter revenues "reflect[] the fact that we are bringing additional
  business on-stream . . . in the PND business, where we continue the
  growth and expansion of that business primarily in Europe." ¶ 101 (J.A.
  101).

## II.     STATEMENT OF FACTS

### A.     Harman's Personal/Portable Navigation Devices

Harman International Industries, Inc. ("Harman" or the "Company") primarily manufactures audio products for the automotive, consumer, and professional markets in the Americas, Europe, and Asia.  ¶ 2 (J.A. 14).[3]  During the Class Period, Harman's Automotive sector comprised approximately 70% of Harman's business and generated the bulk of the Company's revenue and earnings.  ¶ 141 (J.A. 67-68).  In 2006, Harman's Automotive sector began selling PNDs in Europe under the Harman/Becker brand, which was headquartered in Germany.  ¶¶ 49, 57, 58, 67, 72(a) (J.A. 29, 32-34, 39, 41-42).

The Company's PND business appeared to begin with a promising start. Harman reported that 35,000 PND units were sold in the third quarter of fiscal 2006 (January – March 2006), and that 95,000 units were sold in the first quarter of fiscal 2007 (July – September  2006).  ¶¶ 49-50 (J.A. 29).  This led Harman to announce in October 2006 that it expected to sell "well over 500,000 units" in Europe for fiscal 2007, which covered the period from July 1, 2006 to June 30, 2007.  ¶ 50 (J.A. 29).  In January 2007, Harman reported 130,000 units sold, and revised its projection upward, stating that it now expected "sales to exceed 650,000 units" for fiscal 2007.  ¶ 51 (J.A. 29-30).  According to Defendant Brown, the selling price was $350 per unit.  *Id.*

---

[3] Citations to "¶ __" refer to the paragraph of the Complaint being cited.

**B.    The Class Period**

Meanwhile, however, PND inventory levels were rising rapidly. During an April 26, 2007[4] earnings call, Dr. Harman referenced a statement in the previous quarter's call regarding increased inventories. ¶ 57 (J.A. 32). Dr. Harman explained that the rise in inventories was "developed to support a vigorous sales effort," and that Harman "planned to reduce it to normal levels at year-end." *Id.*

On that same call, Harman described its plan for drawing down those inventories: "The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and ***that plan is proceeding***." *Id.* (emphasis added).

Even as Harman was issuing this rosy prognostication about its ability to address its rising PND inventory, however, that inventory was facing significant challenges. For example, a former Accounting Manager familiar with Harman's PND business revealed that much of that inventory was already obsolete at the time of the April 26, 2007 conference call. ¶¶ 54, 55 (J.A. 30-31). Moreover, that obsolescence was largely of Harman's own doing—indeed, between March 2006 and July 2007, Harman released approximately five different versions of the same PND. ¶ 54 (J.A. 30-31). Another former employee, a Sales Engineer responsible for managing

---

[4] That day, Harman also announced a that it had entered into a merger agreement (the "Acquisition") with a company formed by Kohlberg Kravis Roberts & Co. L.P. ("KKR") and an affiliate of Goldman Sachs & Co. ("Goldman") (collectively, the "Purchasing Companies"). ¶ 28 (J.A. 21-22). The Acquisition was valued at $8 billion, and was slated to close in the third quarter of calendar 2007 (July – September 2007). ¶¶ 28, 29 (J.A. 21-22).

Harman's relationship with certain large customers, confirmed that in early 2007, Harman made a modification to its PNDs which rendered PNDs then being stored in a warehouse in Germany obsolete. ¶ 53 (J.A. 30). Moreover, the Accounting Manager stated that it was not until July 2007—after the April 26, 2007 conference call—that the Company sold a significant number of PNDs, and that the company was "one year late in releasing a saleable PND." *Id.*

Harman's PNDs were also overpriced, something that Harman was also aware of at the time of the April 26, 2007 conference call. In early 2007, the Sales Engineer had spoken to Harman's sales representatives about the need for Harman to lower PND prices to remain competitive. ¶ 52 (J.A. 30). Indeed, despite the fact that Defendant Brown quoted an average selling price of $350 during the April 26, 2007 conference call, just a few months later, in July 2007, Harman was forced to reduce prices by approximately $100 per unit just to sell 100,000 inventoried PND units to a company called Paragon. ¶ 56 (J.A. 31). Even then, all 100,000 units were returned to Harman just four months later. ¶ 86(e) (J.A. 48).

Further, according to the Accounting Manager, Harman's Automotive division distributed monthly and fiscal year-end operating reports (the "Operating Reports") that were authored by executives of Harman Automotive in Germany and distributed to Harman International executives, including Defendants Dr. Harman and Brown, and after July 1, 2007 to Defendant Paliwal, as well as to several other executives and numerous lower-level accounting and financial personnel, including the Accounting

6

Manager.  ¶ 55 (J.A. 31).  According to these Operating Reports, Harman missed projected sales of PND units in fiscal 2007, which ended on June 30, 2007, by ***more than 200,000 units***, notwithstanding Harman's confident projections made just a few months earlier.  ¶ 55 (J.A. 31).  Indeed, according to Harman's monthly Operating Report for July 2007, Harman had missed "aggressive" PND sales targets for fiscal 2007 by more than ***$85 million***, or approximately a third of Defendants' forecasted net sales.  ¶ 86(d) (J.A. 48).

Nevertheless, despite these undisclosed, concrete problems facing Harman's European PND business, Harman's August 29, 2007 Form 10-K continued to tout PNDs: "Sales of aftermarket products, particularly PNDs, were ***very strong*** during fiscal 2007."  ¶ 82 (J.A. 46) (emphasis added).  This statement did not square with reality.

The following month, on a September 27, 2007 earnings call, Harman again touted its European PND business.  Harman's total revenues for that quarter had been high, and when asked for the reasons behind the figure, Defendant Brown cited, among other things, Harman's European PND business.  ¶ 101 (J.A. 55).  Specifically, Brown stated that one of the reasons for the "strong first quarter on the top line" was "the fact that . . . we ***continue the growth and expansion of [the PND] business primarily in Europe***."  *Id.* (emphasis added).

By this time, however, sales of PNDs were decidedly ***not*** "very strong," nor was "growth and expansion of the business" occurring in Europe.  Indeed, although

Harman had projected PND sales of over 600,000 units just a few months earlier on the April 2007 earnings call, Harman's **actual** PND sales numbers for fiscal 2007 fell **200,000 units, or $85 million short** of what Harman expected. ¶¶ 55, 86(d) (J.A. 31, 48). Harman did not disclose this shortfall. Indeed, Harman had originally tried to push the sale of 100,000 units to Paragon to completion in June 2007, prior to the fiscal year end, undoubtedly in an attempt to salvage its figures. ¶ 86(e) (J.A. 48). But as explained above, that sale did not go through until July 2007. ¶ 56 (J.A. 31). And even that sale was illusory, as all 100,000 units were returned just a few months later. ¶ 86(e) (J.A. 48). All the while, obsolescence continued to plague Harman's PND inventories.

Yet, not only did Harman fail to disclose the existence of these concrete adverse facts, it continued to issue virtually unqualifiedly optimistic, and misleading, statements about the status of its PND business in Europe.

A mere one quarter later, a stunning reversal would be announced.

## C.      Harman Reveals the Truth about Its PND Business

Harman began revealing the truth about its PND business at the beginning of 2008. Each time, investors reacted sharply and negatively. First, on January 14, 2008, Harman reduced guidance and lowered projected earnings per share for the fiscal year from $5.25 to between $3.00 and $3.10. ¶ 8 (J.A. 16-17). According to Harman, "[t]he change in guidance was prompted **primarily by a major shift in the market for Portable Navigation Devices** (PNDs)." ¶ 109 (J.A. 58) (emphasis added). On

8

this news, Harman's stock fell precipitously from $68.97 to $43 per share, a 37.65 %

drop and a four-year low. *Id.*

And then, in February 2008—just a few months after attributing high revenues

to "the fact that . . . we continue the growth and expansion of [the European PND]

business"—Harman performed a major about-face. Specifically, on February 5, 2008,

Harman issued a press release stating that Harman's "automotive earnings are under

pressure due to portable navigation devices (PND), product mix, and higher

engineering and material costs . . . ." ¶ 113 (J.A. 59-60). It further revealed that

operating income for the quarter ending December 31, 2007 was $61 million, or 5.7

percent of sales, compared to $116 million, or 12.4 percent of sales, in the same

period the prior year. *Id.* Harman admitted that "the decrease in operating income

was driven by PND, product mix, and higher engineering, material and merger costs,"

and that PND sales had fallen by $29 million compared to the same period the prior

year. *Id.*

Most revealingly, Harman finally acknowledged *for the first time* that it had an

obsolescence problem in its PND business, explaining that both PND sales and

margins decreased "due to aggressive price reduction by competitors, the delay of new

products, and ***the sale of older products at substantial discounts.***" *Id.* (emphasis

added).

Later that day, Harman held an earnings call to discuss the press release.

¶¶ 160, 162 (J.A. 74-75). On the call, Paliwal confirmed the press release's startling

9

revelations about Harman's apparently suddenly failing PND business, which in actuality had been facing steadily mounting problems for nearly a year. On this news, shares of Harman stock fell from a closing price of $45.73 on February 5, 2008 to a closing price of $38.70 on February 6, 2008, a more than 15 percent decline. ¶ 114 (J.A. 60).

### D.    Post-Class Period Disclosures

A week later, Harman released its Form 10-Q for the quarter ended December 31, 2007. There, Harman disclosed more specifically the reasons why operating income and margins declined so dramatically in the first half of fiscal 2008 (July 1, 2007 – December 31, 2007):

> For the three and six month periods the gross margin decline was the result of lower margins on PND products, product mix change, including higher sales of lower margin infotainment systems for mid-level vehicles and higher than expected material costs. ***The reduction of the PND margin is the result of three primary factors***: a significant decline in average market prices, delayed introductions and lower volumes of new generation products and ***the inventory clearance of prior generation models at a loss***.
>
> \* \* \*
>
> In January, we announced updated earnings guidance for the fiscal year, which included a decrease in our expected operating profit of more than $100 million. The primary driver of this deterioration is the PND market, with higher-than-expected engineering and material costs also contributing. The PND margin outlook for the 2008 fiscal year has declined by about $60 million. ***This is divided almost equally across three factors***: a significant decline in average market prices; delayed introductions and lower volumes of new generation products; and ***the inventory clearance of prior generation models at a loss***.

¶ 115 (J.A. 60-61) (emphasis added).

## SUMMARY OF ARGUMENT

Defendants' statements regarding Harman's PND business were not forward-looking when made, and thus are not entitled to the protection of the safe harbor under the PSLRA, 15 U.S.C. § 78u-5.

Even if they were forward-looking statements, however, they are nonetheless actionable for two independent reasons. First, they were not accompanied by relevant, let alone meaningful, cautionary language. Second, whatever cautionary language there may have been, it was not meaningful, given Defendants' failure to disclose risks of which they had knowledge, the omission of which misled investors.

In addition, Defendants' statement characterizing Harman's PND sales for fiscal 2007 as "very strong" was not puffery. The statement described a historical fact, namely the Company's PND sales, for a specific timeframe, namely fiscal 2007. A reasonable investor would have taken such information into consideration. Further, immediately before this statement was made, Harman had missed its fiscal 2007 sales targets by 200,000 units, or $85 million, a fact Defendants did not disclose. Thus, Defendants had no reasonable basis for their statement. Indeed, Defendants were aware of facts strongly suggesting the contrary, but did not disclose them to investors.

Finally, Lead Plaintiff has alleged that the Individual Defendants exercised control of the Company within the meaning of Section 20(a) of the Exchange Act, which the Individual Defendants do not challenge. Because Lead Plaintiff has

11

adequately stated a claim against the Company under Section 10(b) and Rule 10b-5, Lead Plaintiff has adequately stated a claim under Section 20(a) as well.

## STANDARD OF REVIEW

Because this case is an appeal from a motion to dismiss for failure to state a claim, the standard of review is *de novo*. *Howard v. Office of Chief Admin. Officer of U.S. House of Representatives*, 720 F.3d 939, 945 (D.C. Cir. 2013); *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In rendering a decision, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## ARGUMENT

## I.    LEAD PLAINTIFF HAS ADEQUATELY STATED A CLAIM UNDER SECTION 10(b)

To establish a claim under Section 10(b) and Rule 10b-5, a plaintiff must demonstrate (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *See Brattain v. Alcitepe*, 934 F. Supp. 2d 119,

129 (D.D.C. 2013) (citing *Janus Capital Grp., Inc. v. First Derivative Traders*, ---- U.S. ----, ---- n. 3, 131 S. Ct. 2296, 2301 n. 3, (2011)).

Defendants moved to dismiss Lead Plaintiff's Complaint for failure to adequately allege (1) material misrepresentations or omissions, (2) scienter, and (3) loss causation. *See generally* Defendants' Statement of Points and Authorities in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("Defs.' P. & A. Supp. Mot. Dismiss"), D.I. 21-1 (J.A. 89).

The District Court dismissed Lead Plaintiff's Complaint, holding that the alleged misstatements were either protected under the PSLRA's safe harbor or were puffery, and were thus not material misrepresentations or omissions.[5]

With respect to the statements at issue in this appeal,[6] the District Court's holding was incorrect for the following reasons: (1) Defendants' statements were not

_____

[5] Although scienter is not an issue on appeal, Lead Plaintiff notes that the District Court, in an extensive footnote, found that "there appears to be a strong argument in favor of Plaintiffs as to the PND products [on the issue of scienter]." Mem. Op., D.I. 57 at 42 n.13 (J.A. 564). Specifically, the District Court noted that given that
(1) "[i]n July of 2007, Defendants were informed that Harman had missed projected PND sales for fiscal 2007 by more than 200,000 units, or by $85 million"; (2) that "between March of 2006 and July of 2007, the company had produced five versions of the PND, each time rendering older versions obsolete and relegating them to being stockpiled in a warehouse"; (3) that "the company was one year late in releasing a saleable PND"; and (4) that "sales were slow because the new units were priced too high to compete with other PNDs," "it appears that Harman 'painted too rosy a picture of [its] current performance and future prospects' . . . despite having 'knowledge of facts or access to information contradict[ing] [such] public statements.'" *Id.* (modifications in original) (citing *Novak v. Kasaks*, 216 F.3d 300, 311-12 (2d Cir. 2000)).
The District Court did not analyze loss causation. Therefore, this Court should remand to the District Court to consider loss causation in the first instance.

forward-looking and thus not entitled to the protection of the PSLRA's safe harbor; (2) even if Defendants' statements were forward-looking, they were not accompanied by relevant, let alone meaningful, cautionary language; (3) the District Court should have considered Defendants' state of mind in assessing whether the asserted cautionary language was meaningful; and (4) Defendants' statement regarding "very strong" PND sales was not puffery.

A.    **Defendants' Statements about the Status of the Company's European PND Business Are Not Entitled to Safe Harbor Protection**

1.    *Defendants' Statements about the Company's European PND Business Were Not Forward-Looking*

The PSLRA provides no safe harbor for material misstatements about a company's present business condition.  *See, e.g., U.S. Sec. & Exch. Comm'n v. e-Smart Techs., Inc.*, No. 11-cv-895, 2014 WL 945816 (D.D.C. Mar. 12, 2014); *Burman v. Phoenix Worldwide Indus., Inc.*, 384 F. Supp. 2d 316, 335-36 (D.D.C. 2005).  "[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present."  *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) ("*Tellabs II*"); *see also In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005) (statement "composed of elements that refer to

---

[6] As noted in the Statement of the Case, Lead Plaintiff appeals the District Court's holdings for three statements only, and does not appeal the District Court's holdings as to the remaining statements.

estimates of future possibilities and elements that refer to present facts" was not

forward-looking).

Statements regarding whether, and to what extent, a business is adhering to a

stated plan of action describe matters of present fact.  *See, e.g.*, *In re REMEC Inc. Sec.

Litig.*, 702 F. Supp. 2d 1202, 1234-35 (S.D. Cal. 2010) (statement that "our China

ramp is proceeding on plan" was not forward-looking); *In re Secure Computing Corp. Sec.

Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (statement that company was "on

track to meet analysts' earnings expectations" was not forward-looking); *In re Copper

Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (statements that

business was "on track" to meet certain goals were not forward-looking "to the extent

that such statements rested upon a characterization of the present state of the

company").  Further, "[a]llegations based upon omissions of existing facts or

circumstances do not constitute forward looking statements protected by the safe

harbor of the Securities Act."  *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901, 930

(D.N.J. 1998) (citing *In re ValuJet, Inc. Sec. Litig.*, 984 F. Supp. 1472, 1479 (N.D. Ga.

1997)).

In *REMEC*, defendants argued that a statement that the company's relocation

of its manufacturing to China was "proceeding on plan" was protected by the safe

harbor.  *REMEC*, 702 F. Supp. 2d at 1234.  The court disagreed, holding that "the

statement describes a current business condition."  *Id.*  Similarly, in *Secure Computing*,

defendants argued that statements that the company was "on track" to meet analysts'

15

revenue estimates for certain time periods were inactionable forward-looking statements. *Secure Computing*, 120 F. Supp. 2d at 818. The court disagreed:

> By stating that Secure was on track to meet expectations, Defendants represented that a reasonable person who knew what Defendants knew at the time the statements were made could reasonably conclude that Secure was likely to meet analysts' expectations. Considered as statements of current business conditions, these statements were not forward-looking.

*Id.*

Here, two statements[7] are at issue:

- Dr. Harman's April 26, 2007 statement that "[t]he plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and ***that plan is proceeding***." ¶ 57 (J.A. 33) (emphasis added).

- Brown's September 27, 2007 statement that Harman's strong first quarter revenues "reflect[] the fact that we are bringing additional business on-stream . . . in the PND business, where ***we continue the growth and expansion of that business*** primarily in Europe." ¶ 101 (J.A. 55) (emphasis added).

The first statement was made during a conference call on April 26, 2007 discussing the Company's fiscal 2007 third quarter (January 1, 2007 through March 31, 2007) results. With respect to its PND sales in Europe, Brown stated that the devices

---

[7] Lead Plaintiff's Complaint asserted other PND-related statements which the District Court found were not actionable, but Lead Plaintiff does not appeal the dismissal of those statements here.

were selling at $350 per unit, ¶ 51 (J.A. 30), while Dr. Harman referenced increased inventories that "had been developed to support a vigorous sales effort," as well as plans "to reduce it to normal levels at year end." ¶ 57 (J.A. 33). Dr. Harman then stated: "The plan forecasts total unit sales of 618,000 units for the fiscal '07 year, and *that plan is proceeding*." *Id.* (emphasis added). When an analyst asked how many units had been sold in the previous three quarters, Brown reported that the number was 300,000. ¶ 58 (J.A. 34). The analyst sought confirmation that despite those numbers, Harman believed it could fulfill the rest of its plan—318,000 additional sales—in the single quarter that remained. *Id.* Dr. Harman responded: "We do, and we said so." *Id.*

By this time, however, several objective facts—which Defendants did not disclose—pointed toward the reality that the plan was in fact *not* proceeding. According to a Sales Engineer responsible for managing the Automotive division's business relations with certain large customers, Harman's PNDs had not been selling at the rate Harman had anticipated in 2006, and consequently, many PNDs were being stored in a warehouse in Germany. ¶ 53 (J.A. 30). Moreover, in early 2007, Harman made modifications to its PNDs that had rendered those inventoried PNDs obsolete. *Id.* Additionally, the Sales Engineer had discussed the fact that the products were overpriced with other sales representatives in early 2007, such that the price Harman quoted during the conference call—$350 per unit—was not actually viable. ¶¶ 52, 54 (J.A. 30-31). Thus, Dr. Harman's April 2007 statement that Harman's "plan [to use

17

sales of 618,000 units to draw down inventories] *is proceeding*" was false and misleading.

When read in the context it was made—describing whether and to what extent Harman was adhering to its plan for drawing down inventories—and considered in light of what was *not* said—that much of the inventory was overpriced and obsolete— Dr. Harman's statement was plainly a representation about Harman's "current business condition," and thus outside the PSLRA's safe harbor. *REMEC*, 702 F. Supp. 2d at 1234.

Furthermore, the allegations here are based in part on Defendants' *omission* of present facts about Harman's overpriced and obsolete inventory. Thus, Dr. Harman's statement is not forward-looking under the PSLRA for this additional reason, as well. *MobileMedia*, 28 F. Supp. 2d at 930. Accordingly, the District Court erred in finding that Dr. Harman's statement that Harman's "plan [to draw down inventories by achieving 618,000 unit sales] is proceeding" was forward-looking.

A few months later, during a September 27, 2007 conference call, Defendants made further representations about the Company's European PND business. In explaining how Harman was able to achieve $950 million in revenue for the first quarter of fiscal 2008 (July 1, 2007 - September 30, 2007), Brown stated that the strong first quarter "reflect[s] *the fact* that we are bringing additional business on-stream . . . in the PND business, where we *continue the growth and expansion of that business* primarily in Europe." ¶ 101 (J.A. 55) (emphasis added).

18

Brown's statement is plainly not forward-looking.  As an initial matter, it is a present-tense statement that describes the present, not the future, and lacks the traditional markers of forward-looking statements; it does not use terms like "expects" or "forecasts."  *See, e.g.*, *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 186 (D.D.C. 2007) ("[U]se of the words 'expect' and 'think' in the predictions convey opinion and hope, and thus a potential of nonrealization.") (quotation and modification omitted).

Further, the context of the statement was that Brown was explaining why revenues for the *current quarter* were high, and one of the principal reasons he gave was "the fact that," *during the current quarter*, "we continue the growth and expansion" of the Company's European PND business.  This was not a "statement of prediction," *Burman*, 384 F. Supp. 2d at 335, but was rather a statement designed to "convey information about the present."  *S. Ferry LP # 2 v. Killinger*, 399 F. Supp. 2d 1121, 1131 (W.D. Wash. 2005), *vacated on other grounds*, 542 F.3d 776 (9th Cir. 2008).  Accordingly, Brown's statement was not forward-looking either.

Since the above two statements are not forward-looking, the PSLRA provides them no safe harbor, and the District Court erred by holding otherwise.[8]

---

[8] Should the Court agree with Lead Plaintiff that the statements were not forward-looking, it need not consider the arguments below regarding cautionary language.

2.    *Even If the Statements at Issue Are Forward-Looking, They Were Not Accompanied by Meaningful Cautionary Language, and Are Thus Actionable*

Even if the above statements are forward-looking, they are actionable because they were not accompanied by relevant cautionary language, let alone the "meaningful" cautionary language the PSLRA requires. Cautionary language is only "meaningful" if it is "substantive and tailored to the specific predictions made in the allegedly misleading statement." *XM Satellite Radio*, 479 F. Supp. 2d at 177 (citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993)). *See also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) ("The requirement for 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors."). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation." *Trump*, 7 F.3d at 371.

Here, the two statements above, if construed as forward-looking statements, essentially predict that Harman's plan to draw down PND inventories via increased PND sales would proceed as planned, and that Harman would continue to grow and expand its European PND business. One of the major extant risks that threatened both predictions, however, was that Harman's inventoried products would not

20

actually be saleable due to, among other things, obsolescence. *Nowhere* did Harman ever warn of this risk.

In the briefing below, Defendants pointed to Harman's 2006 Annual Report (Form 10-K) and earning calls held in October 2006, April 2007, and August 2007 as the sources of allegedly meaningful cautionary language addressing PND-related risks. Defs.' P. & A. Supp. Mot. Dismiss, D.I. 21-1 at 27-28 (J.A. 122-123). However, none of these sources even mentioned that rapid obsolescence might pose a material risk to the Company's PND business, let alone that such obsolescence might be caused by the Company's own product changes, as Lead Plaintiff has alleged. Harman's 2006 Annual Report only mentioned obsolescence by way of explaining how the Company valued inventory.[9] But such statements plainly did nothing to warn investors of the threat that Harman's accumulated PND inventory might become obsolete.

Yet, even as the April 26, 2007 statement was being made, that very threat was materializing. According to the Sales Engineer, Harman had made a modification in *early 2007* which rendered "all of the older-generation units in inventory obsolete." ¶ 64(d) (J.A. 38). By July 2007, Harman was in the process of selling 100,000 obsolete

---

[9] Although Defendants did not specifically cite Harman's 2007 Annual Report (Form 10-K) as a source of cautionary language for PND-related statements, Lead Plaintiff notes that there was no meaningful cautionary language in that document either. Indeed, the only statement that even addressed inventories in a meaningful way was a statement that described increased inventories generally: "Automotive inventories increased significantly due to our entry into the PND market in fiscal 2007." Harman International Industries, 2007 Annual Report (Form 10-K) ("Harman 2007 Annual Report") at 32, D.I. 21-4 at 45 (J.A. 183)). Plainly, however, this statement fails to warn of the threat that those inventories might become obsolete.

PND units at a steep discount to a company called Paragon.  ¶¶ 56, 86(e) (J.A. 31, 48).

Just a few months later, Paragon returned each and every one of those units, causing a

massive loss to Harman.  ¶ 86(e) (J.A. 48).  Moreover, Operating Reports revealed

that by August 2007, Harman had hundreds of millions of dollars' worth of obsolete

Generation 2 PNDs which were being superseded by newer Generation 3 PNDs.

¶ 86(c) (J.A. 47).  Thus, by the time of Brown's September 27, 2007 statement, the

threat of obsolescence had fully materialized.

Months later, in February 2008, Harman finally revealed the true and full

import of the risk of obsolescence when it disclosed that "inventory clearance of prior

generation models at a loss" was one of three "equally" important reasons for a $60

million decline in "PND margin outlook."  ¶ 115 (J.A. 61).

In finding that Harman had made meaningfully cautionary statements, the

District Court credited Harman's statements that the European PND market was

"'extremely competitive' and that the [C]ompany had to work 'extraordinarily hard' to

increase sales and to maintain adequate margins . . . ."  Mem. Op., D.I. 57 at 27 (J.A.

549).  The District Court found this language was sufficient "to balance Dr. Harman's

statement that the company projected total PND unit sales of 618,000 for the fiscal

2007 year."  *Id.* at 27 (J.A. 549).  The District Court reasoned that "[a] reasonable

investor would know that 'extreme' price pressure could substantially affect sales,

margins, or both."  *Id.* at 28 (J.A. 550).

What the District Court failed to consider, however, was that according to Lead Plaintiff's allegations—allegations which the District Court was bound to accept as true, *Tellabs*, 551 U.S. at 322—price competition was not the only, or even the principal, risk that might cause Harman's PND margins to decline. As Harman itself explained in February 2008, factors unrelated to average market price, *i.e.*, price competition, were "equally" important, including "inventory clearance of prior generation models at a loss." ¶ 115 (J.A. 61). In other words, by Harman's own estimation, inventory obsolescence had at least as large a negative impact on its margins as did price competition. Yet despite predicting that Harman would be able to draw down its substantial inventories through a large number of sales, Harman never included **any** cautionary language suggesting that obsolescence might pose a risk, which is of course what happened. Similarly, despite predicting that Harman would continue to grow and expand its European PND business, the Company never included **any** cautionary language that inventory obsolescence might hinder that growth and expansion, which also happened. Thus, none of the cautionary language cited by Defendants below, and relied upon by the District Court, was "substantive and tailored to the specific predictions" regarding drawing down PND inventories and growing and expanding the PND business. *XM Satellite Radio*, 479 F. Supp. 2d at 177. And none of the language constituted "a realistic description of the risks applicable" to Harman's plans for drawing down its inventory of PNDs in Europe, or for growing and expanding its European PND business. *Southland*, 365 F.3d at 372.

23

Accordingly, even if the above statements are construed as forward-looking,[10]

they are nonetheless actionable.[11]

3.    *Whether Cautionary Language Is Meaningful Should Be Informed by Defendants' State of Mind*[12]

A separate and independent reason that Defendants' statements, assuming they

are deemed forward-looking, are actionable, is that at the time Harman issued its

---

[10] Furthermore, the cautionary language contained in Harman's Forms 10-K, relied upon by Defendants and the District Court below, remained largely identical throughout, and even after, the Class Period.  *See* Harman International Industries 2006 Annual Report (Form 10-K) ("Harman's 2006 Annual Report") at 8-12, D.I. 21-30 at 30-34 (J.A. 396-400); Harman's 2007 Annual Report at 9-13, D.I. 21-4 at 22-26 (J.A. 160-164).  *See also* Harman International Industries 2008 Annual Report (Form 10-K) at 9-13, *available at* http://investor.harman.com/common/download/download.cfm?companyid=HAR&fileid=383016&filekey=010B2CA8-08F6-4D13-914B-20ECE328CE0D&filename=hii-2008.pdf (last accessed June 5, 2014).  Indeed, all of Harman's Forms 10-K throughout the Class Period referred largely to the same boilerplate risk factors with respect to product sales.  Continued use of such boilerplate language, without modification, is not "substantive and tailored" and therefore does not meet the high standard required for cautionary statements.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 772-73 (2d Cir. 2010) (finding cautionary language ineffective where it "remained the same even while the problem changed" and was incorporated into statements both before and after disclosures to the public, holding that "[t]he consistency of the defendants' language over time despite the new information they received … belies any contention that the cautionary language was 'tailored to the specific future projection'").  None of these boilerplate risk factors ever mentioned the risk of obsolescence.

[11] A defendant's failure to disclose impending obsolescence has been held affirmatively actionable under Rule 10b-5.  *In re Unicapital Corp. Sec. Litig.*, 149 F. Supp. 2d 1353, 1376 (S.D. Fla. 2001).  Thus, a prediction about the sales prospects of inventoried products that omits that much of those products were or would soon be obsolete, should be actionable as well, for failing to include meaningful cautionary language.

[12] Should the Court agree with Lead Plaintiff that the statements were not accompanied by relevant, let alone meaningful, cautionary language, it need not consider the arguments in this section.

cautionary language about price pressures and extreme competition, which is the language credited by the District Court, Defendants knew but failed to disclose that those risks had already materialized.  Indeed, Defendants had been informed in *early* 2007 that the Company's pricing was not competitive.  ¶ 52 (J.A. 30).  And by the time Brown stated in September 2007 that Harman "continue[s] the growth and expansion of" its PND business in Europe, Defendants knew that, in fact: (1) the Company had *missed* PND sales by more than 200,000 units and at least $85 million for the fiscal year ending June 30, 2007, ¶¶ 55, 56, 86(d) (J.A. 31, 48); (2) the Company had hundreds of millions of dollars in obsolete Generation 2 PNDs in inventory, ¶ 86(c) (J.A. 47); and (3) the Company had been forced to sell 100,000 units of obsolete inventory at a substantial discount.  *Id.*  Possessed with such knowledge, for Defendants to "caution that it is only possible" that price pressure and extreme competition could have a negative impact on PND performance, when those impacts had already materialized in palpable ways, was not meaningfully cautionary, but was instead "deceit."  *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part*, *rev'd in part*, 459 U.S. 375 (1983); *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."); *In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 102-03 (S.D.N.Y. 2006) (same).

25

The District Court, however, declined to consider these facts. It stated that "[b]ecause the safe harbor is linked to materiality, the Court will evaluate Defendants' cautionary language . . . without considering Defendants' state of mind." Mem. Op., D.I. 57 at 24 (J.A. 546).

The District Court rested its interpretation of the PSLRA's safe harbor on three factors: (1) the manner in which cautionary language was considered before the PSLRA came into effect; (2) legislative history; and (3) the alleged need to avoid rendering the subsection (A)(i) safe harbor and Section 78u-5(e) superfluous. Mem. Op., D.I. 57 at 17-24 (J.A. 539-546). Each of these, the District Court reasoned, precluded it from considering what Defendants knew in assessing the adequacy of their cautionary language.[13] However, as will be demonstrated below, none of these factors *requires* the reading of the statute chosen by the District Court, and indeed, point toward the *opposite* conclusion.

>    a.    *Treatment of Forward-Looking Statements Before the PSLRA*

The District Court asserted that its interpretation was "consistent with the manner in which cautionary language was considered even before the PSLRA came into effect." Mem. Op., D.I. 57 at 22 (J.A. 544). In support, it cited the proposition that under the "bespeaks caution" doctrine, "the judicially-created counterpart of the

---

[13] The District Court also cited a number of appellate decisions on this issue, over which there is clearly a split among the Circuits. For the reasons described below, Lead Plaintiff believes that the Circuits that find state of mind relevant to determining whether cautionary language is meaningful have the better reasoned view.

PSLRA's safe harbor provision," "[t]he substantial disclosure of specific risks may render alleged misrepresentations concerning soft information *immaterial* and thus nonactionable as securities fraud." *Id.* (citing *XM Satellite Radio*, 479 F. Supp. 2d at 177-78) (internal quotation marks omitted) (emphasis added in Mem. Op.).  Thus, it concluded that "[b]ecause the safe harbor is linked to materiality, the Court will evaluate Defendants' cautionary language based on its sufficiency and materiality to a reasonable investor without considering Defendants' state of mind." *Id.* at 24 (J.A. 546).

However, this materiality-focused interpretation of the "bespeaks caution" doctrine, which first appeared in *Trump*, 7 F.3d 357 at 371-72, rests on an erroneous interpretation of the doctrine.  Specifically, *Trump* declared that following "what has come to be known as the 'bespeaks caution' doctrine . . . a number of courts of appeals . . . have dismissed securities fraud claims under Rule 12(b)(6) because cautionary language in the offering document negated the materiality of an alleged misrepresentation or omission." *Trump*, 7 F.3d at 371.  In support of this proposition, it cited six cases, four of which use the phrase "bespeak caution," and two of which do not but involve similar reasoning.  Contrary to the *Trump* court's description, however, **none** of the cases held that "cautionary language . . . negated the materiality of an alleged misrepresentation."  Rather, the four cases that used the phrase "bespeak caution" explicitly held that cautionary language negated the **falsity or misleading nature** of a challenged statement.

27

This distinction is not mere hair-splitting. Critically, in assessing a statement's falsity or misleading nature, as opposed to its materiality or immateriality, courts routinely consider the defendant's state of mind, including in the very cases cited by *Trump*.

For example, the first case cited by *Trump* was *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037 (6th Cir. 1991). There, in outlining the "bespeaks caution" doctrine, the court wrote:

> Economic projections are not actionable if they bespeak caution. When a corporation, through its officers or otherwise, states an ***honestly held view based on the information currently before it***, neither it nor its officers may be held liable pursuant to section 10(b) or Rule 10(b)(5). In determining whether the statements are actionable, the court must ***scrutinize the nature of the statement to determine whether the statement was false when made.*** While analyzing the nature of the statement, the court must emphasize whether the prediction suggested reliability, bespoke caution, ***was made in good faith, or had a sound factual or historical basis***. . . . . [I]n light of the cautionary language, Shulze's statement . . . is hardly the type of statement that would mislead a reasonable investor.

948 F.2d at 1040 (emphasis added) (citations omitted).

As another example, in *Romani v. Shearson Lehman Hutton*, in finding that certain documents "clearly 'bespeak caution'" the court also emphasized that there was no indication "that adverse circumstances existed at the time of the offering, ***and were known and deliberately or recklessly disregarded*** by defendants." 929 F.2d 875, 878 (1st Cir. 1991) (emphasis added).

And again, in *Convergent Techs. Sec. Litig.*, which *Trump* described as "applying but not explicitly referencing the bespeaks caution doctrine," 7 F.3d at 371, the court wrote: "There is a difference between knowing that any product-in-development ***may*** run into a few snags, and ***knowing that a particular product has already developed problems so significant as to require months of delay*.*"  948 F.2d 507, 515 (9th Cir. 1991) (emphasis added).

Indeed, the *Trump* court itself appeared to recognize that the defendant's state of mind was relevant to the "bespeaks caution" doctrine.  Specifically, the court cited *Huddleston*, 640 F.2d 534 (5th Cir. 1981) for the proposition that "a general warning was insufficient to render a ***known misrepresentation*** immaterial as a matter of law." *Trump*, 7 F.3d at 371.

The remaining cases cited by *Trump* also make clear that the "bespeaks caution" doctrine was directed not at materiality, but falsity.  *See, e.g., Polin v. Conductron Corp.*, 552 F.2d 797, 806 n.28 (8th Cir. 1977) ("The terms thus employed bespeak caution in outlook and fall far short of the assurances required for a finding of ***falsity and fraud***") (emphasis added), *cert. denied*, 434 U.S. 857 (1977); *see also I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991) (prospectus that "bespeak[s] caution" "***could not mislead*** any reasonable investor").

Thus, prior to *Trump*, the "bespeaks caution" doctrine was focused squarely on assessing the falsity or misleading nature of the challenged statement.  And critically,

in assessing falsity in the context of the "bespeaks caution" doctrine, courts routinely considered the defendant's state of mind.

*Trump* then proceeded to apply *Virginia Bankshares v. Sandberg*, 501 U.S. 1083 (1991). *Virginia Bankshares* did not involve the "bespeaks caution" doctrine *per se*, but was concerned, rather, with whether statements of opinion or belief, which forward-looking statements ultimately are, are actionable in general. Specifically, it concerned whether a proxy statement's characterization of a merger proposal as delivering "high" value at a "fair" price was actionable. In holding that it was, the Supreme Court reasoned that such statements are factual in two senses: (1) as statements that the speaker actually held the opinions stated; and (2) as statements about the subject matter of the reason or belief expressed, which "in a commercial context are reasonably understood to rest on a factual basis that justifies them as accurate[.]" *Virginia Bankshares*, 501 U.S. at 1092-93. Such statements can therefore be false in two ways: (1) if the speaker does not actually hold the opinion; or (2) if the opinion does not rest on a factual basis, "the absence of which renders [the opinion] misleading." *Id.* at 1093.

The Supreme Court considered the defendants' argument that the statements were not actionable, despite being misleading, because the proxy statement contained "statements of facts sufficient to enable readers to draw their own independent conclusions." *Id.* at 1090. The Supreme Court's analysis was as follows:

30

> While a misleading statement will not always lose its deceptive edge simply by joinder with others that are true, the true statements may discredit the other one so obviously that the risk of real deception drops to nil.  Since liability under § 14(a) must rest not only on deceptiveness but materiality as well . . . petitioners are on perfectly firm ground insofar as they argue that publishing accurate facts in a proxy statement can render a misleading proposition too unimportant to ground liability.  But not every mixture with the true will neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow. . . .  Only when the inconsistency would exhaust the misleading conclusion's capacity to influence the reasonable shareholder would a § 14(a) action fail on the element of materiality.

*Id.* at 1097-98 (citations omitted).  Thus, according to this framework, a misleading

statement is immaterial only if accompanying disclosures "discredit" the statement so

completely that the "inconsistency would exhaust the misleading conclusion's capacity

to influence the reasonable shareholder," and the "risk of real deception drops to nil."

*Id.*

    *Trump* claimed that *Virginia Bankshares* "take[s] on the same contours as what

we have denoted as the bespeaks caution doctrine." *Trump* at 372.  But if *Trump* is

correct, applying *Virginia Bankshares* to forward-looking statements would mean that

the inquiry would center on the key question in *Virginia Bankshares*: whether the

challenged (forward-looking) statement was ***knowingly*** false or misleading.  If so,

then the statement would be actionable.

    In response, under *Virginia Bankshares*, a defendant could still argue

immateriality.  To prevail, however, the defendant would have to prove that there

were other disclosures—cautionary language—that "would exhaust the misleading

conclusion's capacity to influence the reasonable shareholder," and "discredit[ed]" the misleading forward-looking statement "so obviously that the risk of real deception drops to nil." *Virginia Bankshares*, 501 U.S. at 1097-98. Such an application of *Virginia Bankshares* to cautionary language sets a substantially higher bar than the one set in *Trump*, which was merely that "cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge," *Trump*, 7 F.3d at 371-72, even if the projections, estimates, or opinions were *knowingly* false and misleading. This correct application of *Virginia Bankshares*—not the one that *Trump* erroneously arrived at—is exactly the interpretation of the PSLRA safe harbor that Lead Plaintiff urges here. Specifically, in the context of knowingly false (and therefore misleading) forward-looking statements, cautionary language is only meaningful if it "exhaust[s] the misleading [forward-looking statement's] capacity to influence the reasonable shareholder," and "discredit[s]" the statement "so obviously that the risk of real deception drops to nil." *Virginia Bankshares*, 501 U.S. at 1097-98.

<div align="center">

b.      *The Legislative History Is Inconclusive*

</div>

Turning next to the safe harbor's legislative history, the Second Circuit has correctly noted that it is somewhat incoherent. Specifically, the Conference Report's instruction that courts not inquire into a "defendant's knowledge of the risks at the time he made the statements" is difficult to square with the Report's requirement that "cautionary statements [ ] convey substantive information about factors that

<div align="center">32</div>

realistically could cause results to differ materially from projections." *Slayton v. Am.*

*Exp. Co.*, 604 F.3d 758, 771 (2d Cir. 2010). As the Second Circuit cogently reasoned:

> In order to assess whether an issuer has identified the factors that realistically could cause results to differ, we must have some reference by which to judge what the realistic factors were at the time the statement was made. We think that the most sensible reference is the major factors that the defendants faced at the time the statement was made. But this requires an inquiry into what the defendants knew because in order to determine what risks the defendants faced, we must ask of what risks were they aware.

*Id.*

The Seventh Circuit has expressed similar skepticism towards the coherence of

the safe harbor's legislative history, noting that it was

> the result of a compromise between legislators who did not want any safe harbor (or, indeed any new legislation), and those who wanted a safe harbor . . . that did not require any cautionary statements but just required the projection to have a reasonable basis. . . . As is often the situation, a compromise enabled the bill to pass but lacks much content; it does not encode a principle on which political forces agreed as much as it signifies conflict about both the scope and the wisdom of the safe harbor.

*Asher v. Baxter Int'l Inc.*, 377 F.3d 727, 732-33 (7th Cir. 2004).

Thus, the Seventh Circuit held that meaningful cautionary language must, at a

minimum, disclose "the major risks [the issuer] objectively faced" at the time of its

forward-looking statement. *See Asher*, 377 F.3d at 734 ("For all we can tell, the major

risks Baxter objectively faced when it made its forecasts were exactly those that,

according to the complaint, came to pass, yet the cautionary statement mentioned

none of them.  Moreover, the cautionary language remained fixed even as the risks

changed.")

> c.    *Considering State of Mind Does Not Render Subsection (A)(i)
> Meaningless*

Turning to the remaining factor, considering a defendant's state of mind in

determining the adequacy of cautionary language would not render subsection (A)(i)

meaningless as a matter of law, notwithstanding the District Court's conclusion to the

contrary.  Specifically, the District Court noted that the PSLRA requires that, "[o]n

any motion to dismiss based upon [the safe harbor], the court shall consider any

statement cited in the complaint and any cautionary statement accompanying the

forward-looking statement, which are not subject to material dispute, cited by the

defendant."  15 U.S.C. § 78u-5(e).  The District Court further noted that "[i]n order to

block a defendant from invoking the subsection (B) safe harbor, a plaintiff must *always*

plead—and later prove—that a defendant's forward-looking statements were made

with actual knowledge that they were false or misleading."  Mem. Op., D.I. 57 at 21

(J.A. 543) (citing 15 U.S.C. § 78u-5(c)(1)(B)).  The District Court further reasoned that

> if a defendant's actual knowledge renders cautionary language
> meaningless as a matter of law, a defendant would never be able to avail
> himself of the subsection (A)(i) safe harbor at the pleadings stage, and
> courts would never have occasion to apply the section 78u-5(e) mandate
> that courts consider cautionary language in ruling upon a motion to
> dismiss.

*Id.* (citing *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795

(11th Cir. 2010)).  Thus, the District Court concluded that the structure of the PSLRA

prohibited it from considering a defendant's state of mind in assessing cautionary language.

The District Court's reasoning, however, rests on an over-reading of Lead Plaintiff's position. The fact that a plaintiff must always allege actual knowledge for a forward-looking statement to be actionable does not mean that a defendant could never avail itself of the subsection (A)(i) safe harbor. Indeed, Lead Plaintiff does not argue here that Defendants' actual knowledge "renders cautionary language meaningless as a matter of law."

Lead Plaintiff alleges that Defendants had actual knowledge that their forward-looking statements regarding PNDs were misleading because Defendants knew about obsolescence and other problems that made those predictions a virtual impossibility. But all Defendants needed to do was warn the investing public that their PND-related predictions were subject to the caveat that Harman was experiencing such problems, and then describe those problems in sufficient detail. Such a disclosure would surely constitute meaningful cautionary language, in part because such a disclosure would prevent investors from drawing incorrect inferences from Defendants' misleading prediction. *See Freeland v. Iridium World Commc'ns, Ltd.*, 545 F. Supp. 2d 59, 73 (D.D.C. 2008) (suggesting that a forward-looking statement made with actual knowledge of falsity could still be adequately cautioned and thus protected by the safe harbor if the language prevents a reasonable investor from drawing an incorrect inference). Indeed, not only does this give full effect to subsection (A)(i) of the safe harbor as

well as Section 78u-5(e), it echoes *Virginia Bankshares'* teaching that to neutralize a

knowingly false statement of belief, which is ultimately what a forward-looking

statement is, the cautionary language must be such that "the risk of real deception

drops to nil."

Thus, the District Court's concern that taking Defendants' state of mind into

consideration in assessing the meaningfulness of cautionary language would render

aspects of the PSLRA superfluous is unfounded.

### B.    Harman's Statement That Sales of PNDs Were "Very Strong During Fiscal 2007" Were Not Mere Puffery

Lead Plaintiff also alleged as materially false and misleading the statement in

Harman's 2007 Annual Report (Form 10-K) that "[s]ales of aftermarket products,

particularly PNDs, were very strong during fiscal 2007."  ¶¶ 82, 86 (J.A. 46-48).

Defendants argued that this statement was inactionable puffery.  Defs.' P. & A. Supp.

Mot. Dismiss, D.I. 21-1 at 22 n. 3 (J.A. 117).

Although the "puffery" rule provides that liability cannot attach to "generalized

statements of optimism that are not capable of objective verification," *XM Satellite*

*Radio*, 479 F. Supp. 2d at 176 (citation omitted), the "rule has its limitations."  *In re*

*Dura Pharm., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) (noting that

the rule does not apply where "(1) the statement is not actually believed, (2) there is

no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts

tending seriously to undermine the statement's accuracy") (citations and quotations omitted).

Indeed, numerous courts have held that statements falsely characterizing business conditions as "strong" are actionable under certain circumstances. *See, e.g., Dura*, 452 F. Supp. 2d at 1033 (finding the statement that "sales and demand for Ceclor CD were 'strong'" was actionable and not puffery because there was "a strong inference [that] there was no reasonable basis for believing such statements"); *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 559 (D.N.J. 2002) (finding the statement that there was "strong customer acceptance" was not puffery because "a reasonable investor likely would consider material any information relating to customer acceptance of key products for purposes of making investment decisions"); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (finding the statements that "business is stronger than ever," that there was a "strong worldwide demand," and that "business fundamentals are strong," were "all actionable when considered as a whole and in light of the alleged improper accounting and revenue inflating practices").

Here, Defendants described the Company's sales of PNDs as "very strong during fiscal 2007" on August 29, 2007. This characterization was plainly more than a "generalized statement of optimism." Rather, it was a description of historical fact, one that a reasonable investor would surely take into consideration when making investment decisions. *See Lucent*, 217 F. Supp. 2d at 559.

More importantly, by the time the statement was made, numerous undisclosed facts—of which Defendants were acutely aware, or recklessly disregarded—made it abundantly clear that the statement was false. First, Harman's PND sales for fiscal 2007, which had ended almost two months prior, were more than ***200,000 units lower*** than what it had projected, ¶ 55 (J.A. 31), or ***$85 million below target***. ¶¶ 56, 86(d) (J.A. 31, 48). This figure represented approximately ***one-third*** of the Company's forecasted net sales. ¶ 86(d) (J.A. 48). Second, Harman had recently struggled—and ultimately failed—to sell 100,000 units, at a steep discount no less, to a company called Paragon. ¶¶ 56, 86(e) (J.A. 31, 48). Third, over the course of fiscal 2007, much of the Company's PNDs had been sitting in inventory, becoming obsolete and unsaleable. ¶¶ 53, 64(b), 64(d), 77, 86(c) (J.A. 30, 38, 44, 47).

Thus, not only did Defendants have "no reasonable basis for believing" that sales in fiscal 2007 were "very strong," these facts were ***undisclosed***, such that Defendants were "aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Dura*, 452 F. Supp. 2d at 1033. Accordingly, Defendants' statement was not "puffery."

The District Court found that the use of "very strong" was "subjective" and "provides no standard against which a comparison can be drawn." Mem. Op., D.I. 57 at 36 (J.A. 558). But a reasonable investor would certainly expect such statements to be pegged to, at the very least, Defendants' actual beliefs about PND sales, and the ostensible bases therefor. *See Dura*, 452 F. Supp. 2d at 1033; *see also Virginia*

*Bankshares*, 501 U.S. at 1093 (explaining that "in a commercial context," even "indefinite and unverifiable" terms such as "high" and "fair" "are reasonably understood to rest on a factual basis that justifies them as accurate, the absence of which renders them misleading"). And here, Defendants had no reasonable basis for believing that their sales were "very strong." Indeed, Defendants had knowledge of facts clearly suggesting just the opposite. By not disclosing such facts and instead claiming that sales were "very strong," Defendants did more than engage in "mere puffery"—they misled investors.

## II.    LEAD PLAINTIFF HAS ADEQUATELY STATED A CLAIM UNDER SECTION 20(a)

Lead Plaintiff has also adequately stated a claim under Section 20(a) of the Exchange Act. Section 20(a) imposes joint and several liability on individuals who exercise control over a violator of the Exchange Act, including corporations. *See Stevens v. InPhonic, Inc.*, 662 F. Supp. 2d 105, 129 (D.D.C. 2009) (citing 15 U.S.C. § 78t(a)). To state a claim under Section 20(a), a plaintiff must allege that a defendant controlled another person, and that the "controlled person" committed the primary violation of the Exchange Act. *See id.* (citing *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)). Here, Lead Plaintiff alleged, and the Individual Defendants did not challenge, that the Individual Defendants had the power to control, and did control, Harman during the Class Period. ¶¶ 183-186 (J.A. 82-83). And, for the reasons described in Section I *supra*, Lead Plaintiff has adequately pled a violation of

39

Section 10(b) of the Exchange Act by Harman. Accordingly, Lead Plaintiff has

adequately stated a claim against the Individual Defendants under Section 20(a).

## CONCLUSION

For the reasons stated above, the decision of the District Court should be

reversed.

Dated:  September 29, 2014              Respectfully submitted,

**COHEN MILSTEIN SELLERS &**
**TOLL PLLC**

/s/ Steven J. Toll
Steven J. Toll (D.C. Bar No. 225623)
Daniel S. Sommers (D.C. Bar No. 416549)
S. Douglas Bunch (D.C. Bar No. 974054)
Times Wang
1100 New York Ave. NW
Suite 500 West
Washington, DC  20005
(202) 408-4600
stoll@cohenmilstein.com
dsommers@cohenmilstein.com
dbunch@cohenmilstein.com
twang@cohenmilstein.com

*Lead Counsel for Lead Plaintiff*
*Arkansas Public Employees'*
*Retirement System*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*10,119*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Garamond*]; or

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated: September 29, 2014          /s/ Steven J. Toll
                                   *Lead Counsel for Lead Plaintiff*
                                     *Arkansas Public Employees'*
                                     *Retirement System*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 29th day of September, 2014, I caused this Brief of Appellant to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Thomas F. Cullen, Jr.
JONES DAY
51 Louisiana Avenue, NW
Washington, DC  20001
(202) 879-3939

*Counsel for Defendants – Appellees*

I further certify that on this 29th day of September, 2014, I caused the required copies of the Brief of Appellant to be hand filed with the Clerk of the Court.

/s/ Steven J. Toll
*Lead Counsel for Lead Plaintiff*
*Arkansas Public Employees'*
*Retirement System*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

15 U.S.C. § 78j ................................................................................ Add. 1

17 C.F.R. § 240.10b-5 ...................................................................... Add. 3

15 U.S.C. § 78t ................................................................................ Add. 7

15 U.S.C. § 78u-5 ............................................................................ Add. 9

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78j

§ 78j. Manipulative and deceptive devices

Currentness

<Notes of Decisions for 15 USCA § 78j are displayed in two separate documents. Notes of Decisions for subdivisions I to XVI are contained in this document. For Notes of Decisions for subdivisions XVII to end, see second document for 15 USCA § 78j.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

**(a)(1)** To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Paragraph (1) of this subsection shall not apply to security futures products.

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement [1] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(c)(1)** To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(2)** Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 1813(q) of Title 12), the National Credit Union Administration, or any other Federal department or agency having a responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) of this section that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) of this section and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 77q(a) of this title and sections 78i, 78o,

Add. 1

78p, 78t, and 78u-1 of this title, and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

**CREDIT(S)**

(June 6, 1934, c. 404, Title I, § 10, 48 Stat. 891; Dec. 21, 2000, Pub.L. 106-554, § 1(a)(5) [Title II, § 206(g), Title III, § 303(d)], 114 Stat. 2763, 2763A-432, 2763A-454; July 21, 2010, Pub.L. 111-203, Title VII, § 762(d)(3), Title IX, §§ 929L(2), 984(a), 124 Stat. 1761, 1861, 1932.)

### EFFECTIVE DATE OF 2010 AMENDMENT

&lt;Unless otherwise provided, amendment by subtitle B (sections 761-774) of Title VII of Pub.L. 111-203, effective on the later of 360 days after July 21, 2010, or, to the extent a provision of subtitle B requires a rulemaking, not less than 60 days after publication of the final rule or regulation implementing such provision of subtitle B, see 2010 Amendment notes and 2010 Effective and Applicability Provisions notes set out under this section.&gt;

Notes of Decisions (6923)

Footnotes

1        So in original. Probably should be followed by a comma.

15 U.S.C.A. § 78j, 15 USCA § 78j

Current through P.L. 113-93 (excluding P.L. 113-79) approved 4-1-14

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
    Title 17. Commodity and Securities Exchanges
        Chapter II. Securities and Exchange Commission
            Part 240. General Rules and Regulations, Securities Exchange Act of 1934 (Refs & Annos)
            Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
                Manipulative and Deceptive Devices and Contrivances

17 C.F.R. § 240.10b–5

§ 240.10b–5 Employment of manipulative and deceptive devices.

Currentness

<Notes of Decisions for 17 CFR § 240.10b–5 are displayed in separate documents. Notes of Decisions for subdivisions I to IX are contained in this document. For text of section, and references, see first document for 17 CFR § 240.10b–5. For Notes of Decisions for subdivisions X to end, see documents for 17 CFR § 240.10b–5, post.>

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

(Authority: Sec. 10; 48 Stat. 891; 15 U.S.C. 78j)

**Credits**
[13 FR 8183, Dec. 22, 1948, as amended at 16 FR 7928, Aug. 11, 1951]

SOURCE: 50 FR 27946, July 9, 1985; 50 FR 28394, July 12, 1985; 50 FR 37654, Sept. 17, 1985; 50 FR 41870, Oct. 16, 1985; 50 FR 42678, Oct. 22, 1985; 51 FR 8801, March 14, 1986; 51 FR 12127, April 9, 1986; 51 FR 14982, April 22, 1986; 51 FR 18580, May 21, 1986; 51 FR 25882, July 17, 1986; 51 FR 36551, Oct. 14, 1986; 51 FR 44275, Dec. 9, 1986; 52 FR 3000, Jan. 30, 1987; 52 FR 8877, March 20, 1987; 52 FR 9154, March 23, 1987; 52 FR 16838, May 6, 1987; 52 FR 27969, July 24, 1987; 52 FR 42279, Nov. 4, 1987; 53 FR 26394, July 12, 1988; 53 FR 33459, Aug. 31, 1988; 53 FR 37289, Sept. 26, 1988; 54 FR 23976, June 5, 1989; 54 FR 28813, July 10, 1989; 54 FR 30031, July 18, 1989; 54 FR 35481, Aug. 28, 1989; 54 FR 37789, Sept. 13, 1989; 55 FR 23929, June 13, 1990; 55 FR 50320, Dec. 6, 1990; 56 FR 7265, Feb. 21, 1991; 56 FR 9129, March 5, 1991; 56 FR 12118, March 22, 1991; 56 FR 19156, April 25, 1991; 56 FR 28322, June 20, 1991; 56 FR 30067, July 1, 1991; 57 FR 18218, April 29, 1992; 57 FR 32168, July 21, 1992; 57 FR 36501, Aug. 13, 1992; 57 FR 47409, Oct. 16, 1992; 58 FR 14682, March 18, 1993; 59 FR 10985, March 9, 1994; 59 FR 55012, Nov. 2, 1994; 59 FR 66709, Dec. 28, 1994; 61 FR 48328, Sept. 12, 1996; 62 FR 543, Jan. 3, 1997; 62 FR 6071, Feb. 10, 1997; 62 FR 12749, March 18, 1997; 62 FR 35340, July 1, 1997;

63 FR 8102, Feb. 18, 1998; 63 FR 13944, March 23, 1998; 65 FR 76087, Dec. 5, 2000; 66 FR 21659, May 1, 2001; 66 FR 43741, Aug. 20, 2001; 66 FR 55837, 55838, Nov. 2, 2001; 67 FR 247, Jan. 2, 2002; 67 FR 57288, Sept. 9, 2002; 67 FR 58299, Sept. 13, 2002; 68 FR 4355, Jan. 28, 2003; 68 FR 5364, Feb. 3, 2003; 68 FR 18818, April 16, 2003; 68 FR 36665, June 18, 2003; 68 FR 64970, Nov. 17, 2003; 68 FR 67009, Nov. 28, 2003; 68 FR 69221, Dec. 11, 2003; 71 FR 65407, Nov. 8, 2006; 71 FR 74708, Dec. 12, 2006; 71 FR 76596, Dec. 21, 2006; 72 FR 4166, Jan. 29, 2007; 74 FR 68365, Dec. 23, 2009; 75 FR 2794, Jan. 19, 2010; 75 FR 9081, Feb. 26, 2010; 75 FR 54477, Sept. 8, 2010; 75 FR 64653, Oct. 20, 2010; 76 FR 4511, Jan. 26, 2011; 76 FR 6045, Feb. 2, 2011; 76 FR 34363, June 13, 2011; 76 FR 34590, June 14, 2011; 76 FR 41685, July 15, 2011; 76 FR 46620, Aug. 3, 2011; 76 FR 71876, Nov. 21, 2011; 77 FR 30751, May 23, 2012; 77 FR 38454, June 27, 2012; 77 FR 41647, July 13, 2012; 77 FR 48356, Aug. 13, 2012; 77 FR 56362, Sept. 12, 2012; 77 FR 56417, Sept. 12, 2012; 77 FR 66285, Nov. 2, 2012; 77 FR 73305, Dec. 10, 2012; 78 FR 4783, Jan. 23, 2013; 78 FR 42450, July 16, 2013; 78 FR 67633, Nov. 12, 2013; 79 FR 1548, Jan. 8, 2014, unless otherwise noted.

AUTHORITY: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78k, 78k–1, 78l, 78m, 78n, 78n–1, 78o, 78o–4, 78o–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78ll, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 et seq., and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C. 5221(e)(3); 18 U.S.C. 1350, unless otherwise noted.; Section 240.3a4–1 also issued under secs. 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121 as amended;; Section 240.3a12–8 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), and 23(a), 15 U.S.C. 78w(a);; Section 240.3a12–10 also issued under 15 U.S.C. 78b and c;; Section 240.3a12–9 also issued under secs. 3(a)(12), 7(c), 11(d)(1), 15 U.S.C. 78g(c), 78k(d)(1);; Sections 240.3a43–1 and 240.3a44–1 also issued under sec. 3; 15 U.S.C. 78c;; Sections 3a67–1 through 3a67–9 and 3a71–1 and 3a71–2 are also issued under Pub.L. 111–203, §§ 712, 761(b), 124 Stat. 1841 (2010).; Section 240.3b–6 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.3b–9 also issued under secs. 2, 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121, as amended (15 U.S.C. 78b, 78c, 78o);; Section 240.9b–1 is also issued under sec. 2, 7, 10, 19(a), 48 Stat. 74, 78, 81, 85; secs. 201, 205, 209, 120, 48 Stat. 905, 906, 908; secs. 1–4, 8, 68 Stat. 683, 685; sec. 12(a), 73 Stat. 143; sec. 7(a), 74 Stat. 412; sec. 27(a), 84 Stat. 1433; sec. 308(a)(2), 90 Stat. 57; sec. 505, 94 Stat. 2292; secs. 9, 15, 23(a), 48 Stat. 889, 895, 901; sec. 230(a), 49 Stat. 704; secs. 3, 8, 49 Stat. 1377, 1379; sec. 2, 52 Stat. 1075; secs. 6, 10, 78 Stat. 570–574, 580; sec. 11(d), 84 Stat. 121; sec. 18, 89 Stat. 155; sec. 204, 91 Stat. 1500; 15 U.S.C. 77b, 77g, 77j, 77s(a), 78j, 78m, 78w(a);; Section 240.10b–10 is also issued under secs. 2, 3, 9, 10, 11, 11A, 15, 17, 23, 48 Stat. 891, 89 Stat. 97, 121, 137, 156, (15 U.S.C. 78b, 78c, 78i, 78j, 78k, 78k–1, 78o, 78q);; Section 240.12a–7 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), 6, 15 U.S.C. 78(f), 11A, 15 U.S.C. 78k, 12, 15 U.S.C. 78(l), and 23(a)(1), 15 U.S.C. 78(w)(a)(1).; Sections 240.12b–1 to 240.12b–36 also issued under secs. 3, 12, 13, 15, 48 Stat. 892, as amended 89 Stat. 895, as amended; 15 U.S.C. 78c, 78l, 78m, 78o;; Section 240.12b–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.12b–25 is also issued under 15 U.S.C. 80a–8, 80a–24(a), 80a–29, and 80a–37.; Section 240.12g–3 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.12g3–2 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.13a–10 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.13a–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13a–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.13d–3 is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Sections 240.13e–4, 240.14d–7, 240.14d–10 and 240.14e–1 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(d) and 14(e), 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(d) and 78n(e) and sec. 23(c) of the Investment Company Act of 1940, 15 U.S.C. 80a–23(c);; Sections 240.13e–4 to 240.13e–101 also issued under secs. 3(b), 9(a)(6), 10(b), 13(e), 14(e), 15(c)(1), 48 Stat. 882, 889, 891, 894, 895, 901, sec. 8, 49 Stat. 1379, sec. 5, 78 Stat. 569, 570, secs. 2, 3, 82 Stat. 454, 455, secs. 1, 2, 3–5, 84 Stat. 1497, secs. 3, 18, 89 Stat. 97, 155; 15 U.S.C. 78c(b), 78i(a)(6), 78j(b), 78m(e), 78n(e), 78o(c); sec. 23(c) of the Investment Company Act of 1940; 54 Stat. 825; 15 U.S.C. 80a–23(c);; Section 240.13f–2(T) also issued under sec. 13(f)(1) (15 U.S.C. 78m(f)(1));

Section 240.13p–1 is also issued under sec. 1502, Pub.L. 111–203, 124 Stat. 1376.; Section 240.13q–1 is also issued under sec. 1504, Pub.L. 111–203, 124 Stat. 2220.; Sections 240.14a–1, 240.14a–3, 240.14a–13, 240.14b–1, 240.14b–2, 240.14c–1, and 240.14c–7 also issued under secs. 12, 15 U.S.C. 78l, and 14, Pub.L. 99–222, 99 Stat. 1737, 15 U.S.C. 78n;; Sections 240.14a–3, 240.14a–13, 240.14b–1 and 240.14c–7 also issued under secs. 12, 14 and 17, 15 U.S.C. 78l, 78n and 78g;; Sections

240.14c–1 to 240.14c–101 also issued under sec. 14, 48 Stat. 895; 15 U.S.C. 78n;; Section 240.14d–1 is also issued under 15 U.S.C. 77g, 77j, 77s(a), 77tt(a), 80a–37.; Section 240.14e–2 is also issued under 15 U.S.C. 77g, 77h, 77s(a), 77sss, 80a–37(a).; Section 240.14e–4 also issued under the Exchange Act, 15 U.S.C. 78a et seq., and particularly sections 3(b), 10(a), 10(b), 14(e), 15(c), and 23(a) of the Exchange Act (15 U.S.C. 78c(b), 78j(a), 78j(b), 78n(e), 78o(c), and 78w(a)).; Section 240.15a–6, also issued under secs. 3, 10, 15, and 17, 15 U.S.C. 78c, 78j, 78o, and 78q;; Section 240.15b1–3 also issued under sec. 15, 17; 15 U.S.C. 78o78q;; Sections 240.15b1–3 and 240.15b2–1 also issued under 15 U.S.C. 78o, 78q;; Section 240.15b2–2 also issued under secs. 3, 15; 15 U.S.C. 78c, 78o;; Sections 240.15b10–1 to 240.15b10–9 also issued under secs. 15, 17, 48 Stat. 895, 897, sec. 203, 49 Stat. 704, secs. 4, 8, 49 Stat. 1379, sec. 5, 52 Stat. 1076, sec. 6, 78 Stat. 570; 15 U.S.C. 78o, 78q, 12 U.S.C. 241 nt.;; Section 240.15c2–6, also issued under secs. 3, 10, and 15, 15 U.S.C. 78c, 78j, and 78o.; Section 240.15c2–11 also issued under 15 U.S.C. 78j(b), 78o(c), 78q(a), and 78w(a).; Section 240.15c2–12 also issued under 15 U.S.C. 78b, 78c, 78j, 78o, 78o–4 and 78q.; Section 240.15c3–1 is also issued under secs. 15(c)(3), 15 U.S.C. 78o(c)(3).; Sections 240.15c3–1a, 240.15c3–1e, 240.15c3–1f, 240.15c3–1g are also issued under Pub.L. 111–203, secs. 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78o–7 note).; Section 240.15c3–3 is also issued under 15 U.S.C. 78o(c)(2), 78(c)(3), 78q(a), 78w(a); sec. 6(c), 84 Stat. 1652; 15 U.S.C. 78fff.; Section 240.15c3–3a is also issued under Pub.L. 111–203, §§ 939, 939A, 124. Stat. 1376 (2010) (15 U.S.C. 78c, 15 U.S.C. 78o–7 note).; Section 240.15c3–3(o) is also issued under Pub.L. 106–554, 114 Stat. 2763, section 203.; Section 240.15d–5 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.15d–10 is also issued under 15 U.S.C. 80a–20(a) and 80a–37(a), and secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15d–11 is also issued under secs. 3(a) and 306(a), Pub.L. 107–204, 116 Stat. 745.; Section 240.15d–14 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Section 240.15d–15 is also issued under secs. 3(a) and 302, Pub.L. No. 107–204, 116 Stat. 745.; Sections 240.15Ba1–1 through 240.15Ba1–8 are also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010). ; Section 240.15Bc4–1 is also issued under sec. 975, Public Law 111–203, 124 Stat. 1376 (2010). ; Sections 240.15Ca1–1, 240.15Ca2–1, 240.15Ca2–2, 240.15Ca2–3, 240.15Ca2–4, 240.15Ca2–5, 240.15Cc1–1 also issued under secs. 3, 15C; 15 U.S.C. 78c, 78o–5;; Section 240.15Ga–1 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.16a–1(a) is also issued under Public Law 111–203 § 766, 124 Stat. 1799 (2010).; Section 240.17a–3 also issued under secs. 2, 17, 23a, 48 Stat. 897, as amended; 15 U.S.C. 78d–1, 78d–2, 78q; secs. 12, 14, 17, 23(a), 48 Stat. 892, 895, 897, 901; secs. 1, 4, 8, 49 Stat. 1375, 1379; sec. 203(a), 49 Stat. 704; sec. 5, 52 Stat. 1076; sec. 202, 68 Stat. 686; secs. 3, 5, 10, 78 Stat. 565-568, 569, 570, 580; secs. 1, 3, 82 Stat. 454, 455; secs. 28(c), 3–5, 84 Stat. 1435, 1497; sec. 105(b), 88 Stat. 1503; secs. 8, 9, 14, 18, 89 Stat. 117, 118, 137, 155

15 U.S.C. 78l, 78n, 78q, 78w(a); ; Section 240.17a–4 also issued under secs. 2, 17, 23(a), 48 Stat. 897, as amended; 15 U.S.C. 78a, 78d–1, 78d–2; sec. 14, Pub.L. 94–29, 89 Stat. 137 (15 U.S.C. 78a); sec. 18, Pub.L. 94–29, 89 Stat. 155 (15 U.S.C. 78w);; Section 240.17a–23 also issued under 15 U.S.C. 78b, 78c, 78o, 78q, and 78w(a);; Section 240.17f–1 is also authorized under sections 2, 17 and 17A, 48 Stat. 891, 89 Stat. 137, 141 (15 U.S.C. 78b, 78q, 78q–1);; Section 240.17g–7 is also issued under sec. 943, Pub.L. 111–203, 124 Stat. 1376.; Section 240.17h–1T also issued under 15 U.S.C. 78q.; Sections 240.17Ac2–1(c) and 240.17Ac2–2 also issued under secs. 17, 17A and 23(a); 48 Stat. 897, as amended, 89 Stat. 137, 141 and 48 Stat. 901 (15 U.S.C. 78q, 78q–1, 78w(a));; Section 240.17Ad–1 is also issued under secs. 2, 17, 17A and 23(a); 48 Stat. 841 as amended, 48 Stat. 897, as amended, 89 Stat. 137, 141, and 48 Stat. 901 (15 U.S.C. 78b, 78q, 78q–1, 78w);; Sections 240.17Ad–5 and 240.17Ad–10 are also issued under secs. 3 and 17A; 48 Stat. 882, as amended, and 89 Stat. (15 U.S.C. 78c and 78q–1);; Section 240.17Ad–7 also issued under 15 U.S.C. 78b, 78q, and 78q–1.; Section 240.17Ad–17 is also issued under Pub.L. 111–203, section 929W, 124 Stat. 1869 (2010).; Section 240.17Ad–22 is also issued under 12 U.S.C. 5464(a)(2).; Section 240.19b–4 is also issued under 12 U.S.C. 5465(e).; Sections 240.19c–4 also issued under secs. 6, 11A, 14, 15A, 19 and 23 of the Securities Exchange Act of 1934 (15 U.S.C. 78o–3, and 78s);; Section 240.19c–5 also issued under Sections 6, 11A, and 19 of the Securities Exchange Act of 1934, 48 Stat. 885, as amended, 89 Stat. 111, as amended, and 48 Stat. 898, as amended, 15 U.S.C. 78f, 78k–1, and 78s.; Section 240.21F is also issued under Pub.L. 111–203, § 922(a), 124 Stat. 1841 (2010).; Section 240.31–1 is also issued under sec. 31, 48 Stat. 904, as amended (15 U.S.C. 78ee).

Notes of Decisions (1753)

Current through May 29, 2014; 79 FR 31014.

**End of Document**

© 2014 Thomson Reuters. No claim to original U.S. Government Works.

Add. 6

United States Code Annotated
Title 15. Commerce and Trade
Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78t

§ 78t. Liability of controlling persons and persons who aid and abet violations

Currentness

(a) Joint and several liability; good faith defense

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

(b) Unlawful activity through or by means of any other person

It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person.

(c) Hindering, delaying, or obstructing the making or filing of any document, report, or information

It shall be unlawful for any director or officer of, or any owner of any securities issued by, any issuer required to file any document, report, or information under this chapter or any rule or regulation thereunder without just cause to hinder, delay, or obstruct the making or filing of any such document, report, or information.

(d) Liability for trading in securities while in possession of material nonpublic information

Wherever communicating, or purchasing or selling a security while in possession of, material nonpublic information would violate, or result in liability to any purchaser or seller of the security under any provisions of this chapter, or any rule or regulation thereunder, such conduct in connection with a purchase or sale of a put, call, straddle, option, privilege or security-based swap agreement with respect to such security or with respect to a group or index of securities including such security, shall also violate and result in comparable liability to any purchaser or seller of that security under such provision, rule, or regulation.

(e) Prosecution of persons who aid and abet violations

For purposes of any action brought by the Commission under paragraph (1) or (3) of section 78u(d) of this title, any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided.

(f) Limitation on Commission authority

Add. 7

USCA Case #14-7017    Document #1514408    Filed: 09/29/2014    Page 61 of 67

The authority of the Commission under this section with respect to security-based swap agreements shall be subject to the restrictions and limitations of section 78c-1(b) of this title.

**CREDIT(S)**

  (June 6, 1934, c. 404, Title I, § 20, 48 Stat. 899; May 27, 1936, c. 462, § 6, 49 Stat. 1379; Pub.L. 88-467, § 9, Aug. 20, 1964, 78 Stat. 579; Pub.L. 98-376, § 5, Aug. 10, 1984, 98 Stat. 1265; Pub.L. 104-67, Title I, § 104, Dec. 22, 1995, 109 Stat. 757; Pub.L. 105-353, Title III, § 301(b)(12), Nov. 3, 1998, 112 Stat. 3236; Pub.L. 106-554, § 1(a)(5) [Title II, § 205(a)(3), Title III, § 303(i), (j)], Dec. 21, 2000, 114 Stat. 2763, 2763A-426, 2763A-456; Pub.L. 111-203, Title VII, § 762(d)(6), Title IX, §§ 929O, 929P(c), July 21, 2010, 124 Stat. 1761, 1862, 1865.)

<div align="center">

**EFFECTIVE DATE OF 2010 AMENDMENT**

</div>

  <Unless otherwise provided, amendment by subtitle B (Secs. 761-774) of Title VII of Pub.L. 111-203, effective on the later of 360 days after July 21, 2010, or, to the extent a provision of subtitle B requires a rulemaking, not less than 60 days after publication of the final rule or regulation implementing such provision of subtitle B, see 2010 Amendment notes and 2010 Effective and Applicability Provisions notes set out under this section.>

Notes of Decisions (680)

15 U.S.C.A. § 78t, 15 USCA § 78t
Current through P.L. 113-93 (excluding P.L. 113-79) approved 4-1-14

---

**End of Document**                                    © 2014 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78u-5

§ 78u-5. Application of safe harbor for forward-looking statements

Currentness

(a) Applicability

This section shall apply only to a forward-looking statement made by--

**(1)** an issuer that, at the time that the statement is made, is subject to the reporting requirements of section 78m(a) of this title or section 78o(d) of this title;

**(2)** a person acting on behalf of such issuer;

**(3)** an outside reviewer retained by such issuer making a statement on behalf of such issuer; or

**(4)** an underwriter, with respect to information provided by such issuer or information derived from information provided by such issuer.

(b) Exclusions

Except to the extent otherwise specifically provided by rule, regulation, or order of the Commission, this section shall not apply to a forward-looking statement--

**(1)** that is made with respect to the business or operations of the issuer, if the issuer--

**(A)** during the 3-year period preceding the date on which the statement was first made--

**(i)** was convicted of any felony or misdemeanor described in clauses (i) through (iv) of section 78o(b)(4)(B) of this title; or

**(ii)** has been made the subject of a judicial or administrative decree or order arising out of a governmental action that--

**(I)** prohibits future violations of the antifraud provisions of the securities laws;

Add. 9

**(II)** requires that the issuer cease and desist from violating the antifraud provisions of the securities laws; or

**(III)** determines that the issuer violated the antifraud provisions of the securities laws;

**(B)** makes the forward-looking statement in connection with an offering of securities by a blank check company;

**(C)** issues penny stock;

**(D)** makes the forward-looking statement in connection with a rollup transaction; or

**(E)** makes the forward-looking statement in connection with a going private transaction; or

**(2)** that is--

**(A)** included in a financial statement prepared in accordance with generally accepted accounting principles;

**(B)** contained in a registration statement of, or otherwise issued by, an investment company;

**(C)** made in connection with a tender offer;

**(D)** made in connection with an initial public offering;

**(E)** made in connection with an offering by, or relating to the operations of, a partnership, limited liability company, or a direct participation investment program; or

**(F)** made in a disclosure of beneficial ownership in a report required to be filed with the Commission pursuant to section 78m(d) of this title.

(c) Safe harbor

(1) In general

Except as provided in subsection (b) of this section, in any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--

**(A)** the forward-looking statement is--

Add. 10

**(i)** identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

**(ii)** immaterial; or

**(B)** the plaintiff fails to prove that the forward-looking statement--

**(i)** if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

**(ii)** if made by a business entity; [1] was--

**(I)** made by or with the approval of an executive officer of that entity; and

**(II)** made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

(2) Oral forward-looking statements

In the case of an oral forward-looking statement made by an issuer that is subject to the reporting requirements of section 78m(a) of this title or section 78o(d) of this title, or by a person acting on behalf of such issuer, the requirement set forth in paragraph (1)(A) shall be deemed to be satisfied--

**(A)** if the oral forward-looking statement is accompanied by a cautionary statement--

**(i)** that the particular oral statement is a forward-looking statement; and

**(ii)** that the actual results might differ materially from those projected in the forward-looking statement; and

**(B)** if--

**(i)** the oral forward-looking statement is accompanied by an oral statement that additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document, or portion thereof;

**(ii)** the accompanying oral statement referred to in clause (i) identifies the document, or portion thereof, that contains the additional information about those factors relating to the forward-looking statement; and

**(iii)** the information contained in that written document is a cautionary statement that satisfies the standard established in paragraph (1)(A).

(3) Availability

Any document filed with the Commission or generally disseminated shall be deemed to be readily available for purposes of paragraph (2).

(4) Effect on other safe harbors

The exemption provided for in paragraph (1) shall be in addition to any exemption that the Commission may establish by rule or regulation under subsection (g) of this section.

(d) Duty to update

Nothing in this section shall impose upon any person a duty to update a forward-looking statement.

(e) Dispositive motion

On any motion to dismiss based upon subsection (c)(1) of this section, the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant.

(f) Stay pending decision on motion

In any private action arising under this chapter, the court shall stay discovery (other than discovery that is specifically directed to the applicability of the exemption provided for in this section) during the pendency of any motion by a defendant for summary judgment that is based on the grounds that--

**(1)** the statement or omission upon which the complaint is based is a forward-looking statement within the meaning of this section; and

**(2)** the exemption provided for in this section precludes a claim for relief.

(g) Exemption authority

In addition to the exemptions provided for in this section, the Commission may, by rule or regulation, provide exemptions from or under any provision of this chapter, including with respect to liability that is based on a statement or that is based on projections or other forward-looking information, if and to the extent that any such exemption is consistent with the public interest and the protection of investors, as determined by the Commission.

(h) Effect on other authority of Commission

WestlawNext © 2014 Thomson Reuters. No claim to original U.S. Government Works.      4

Add. 12

Nothing in this section limits, either expressly or by implication, the authority of the Commission to exercise similar authority or to adopt similar rules and regulations with respect to forward-looking statements under any other statute under which the Commission exercises rulemaking authority.

(i) Definitions

For purposes of this section, the following definitions shall apply:

(1) Forward-looking statement

The term "forward-looking statement" means--

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

(2) Investment company

The term "investment company" has the same meaning as in section 80a-3(a) of this title.

(3) Going private transaction

The term "going private transaction" has the meaning given that term under the rules or regulations of the Commission issued pursuant to section 78m(e) of this title.

(4) Person acting on behalf of an issuer

Add. 13

USCA Case #14-7017     Document #1514408          Filed: 09/29/2014     Page 67 of 67

The term "person acting on behalf of an issuer" means any officer, director, or employee of such issuer.

(5) Other terms

The terms "blank check company", "roll-up transaction", "partnership", "limited liability company", "executive officer of an entity" and "direct participation investment program", have the meanings given those terms by rule or regulation of the Commission.

**CREDIT(S)**

(June 6, 1934, c. 404, Title I, § 21E, as added Dec. 22, 1995, Pub.L. 104-67, Title I, § 102(b), 109 Stat. 753.)

Notes of Decisions (179)

Footnotes

1        So in original. The semicolon probably should be a comma.

15 U.S.C.A. § 78u-5, 15 USCA § 78u-5

Current through P.L. 113-93 (excluding P.L. 113-79) approved 4-1-14

---

End of Document                                         © 2014 Thomson Reuters. No claim to original U.S. Government Works.

Add. 14